RICHMOND POWER & LIGHT OF the
CITY OF RICHMOND,
INDIANA, Petitioner

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

General Motors Corporation, Potomac
Electric Power Company and Appalachian Power Company, et al., Intervenors.

Representative Michael J. HARRINGTON, of Massachusetts, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

General Motors Corporation, Potomac
Electric Power Company and Appalachian Power Company, et al., Intervenors.

Nos. 75–2143 and 75–2144.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1977.

Decided March 13, 1978.

George Spiegel, Washington, D. C., with whom Frances E. Francis and Bonnie S. Blair, Washington, D. C., were on the brief, for petitioners.

Scott M. DuBoff, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

Louis Flax, Washington, D. C., with whom Frazier F. Hilder, Detroit, Mich., was on the brief, for intervenor General Motors Corp.

William J. Manning, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Peter J. Schlesinger, New York City, was on the brief, for intervenors Appalachian Power Co., et al.

Edward A. Caine, Washington, D. C., was on the brief for intervenor Potomac Elec. Power Co.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We are presented here with disputes arising from attempts by the Federal Power Commission [1] to encourage voluntary responses by electric utilities to problems cre-

---

1. The powers and duties of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission as of October 1, 1977. Department of Energy Organization Act, 42 U.S.C.A. 7171–7177, 7295(c) (West Supp. Nov. 1977). Because the events relevant to this case occurred before that time, we will continue to refer to the Federal Power Commission in this opinion.

ated by the 1973 oil embargo. The issues are whether the Commission reasonably exercised its discretion in rejecting invocation of its emergency powers, in setting rates for service voluntarily furnished during the crisis, and in deferring detailed consideration of an allegation of unlawful discrimination. We hold that in each action it did.

## I. INTRODUCTION

To counteract oil shortages threatened by the embargo, the Commission on November 29, 1973, implored the Nation's electric utilities to make maximum use of other fuels.[2] Because utilities in some sectors of the country, such as New England, relied heavily on oil for their boilers, the Commission called for the transfer, when feasible, of electricity from regions with excess non-oil-fired capacity—primarily areas in which coal was heavily utilized—to those short on petroleum. The Commission also sought the help of the National Electric Reliability Council in establishing a voluntary program of emergency transmissions. Since an alternative solution was to convert East Coast plants to coal-fired boilers and then to ship coal to the East, the process of transferring electricity became known as "coal by wire." A number of utilities volunteered to participate.

Concerned by forecasts of dire oil shortfalls and apparently doubting the efficacy of the voluntary program, the New England Power Pool (NEPOOL)[3] on January 10, 1974, petitioned the Commission to order utilities east of the Mississippi River with excess capacity to supply it with energy.[4] NEPOOL sought to convince the Commission to use to this end its emergency authority under Section 202(c) of the Federal

Power Act.[5] The Commission responded immediately by ordering the eastern utilities to notify NEPOOL of any excess capacity available for coal-by-wire transactions and by convening a public conference to arrange a voluntary solution of NEPOOL's problems. Participants in this and four additional meetings discussed needs, schedules, rates, limitations and the effects of coal-by-wire service on the local obligations of supplying utilities. By the time of the final conference, the purchasing, transmitting and supplying utilities and participating state regulatory commissions had arrived at substantial agreement. The supplying and transmitting utilities subsequently filed new or amended rate schedules, which specified refunds in excess of $2 million on charges at previously higher rates, and NEPOOL moved to withdraw its petition for emergency relief.

The Commission's staff expressed its approval of the rates. Conceptualizing "fuel conservation service" as a series of transfers scheduled on a weekly or slightly longer basis, the staff recommended that the rate structure resemble those frequently employed for short-term power, including recovery of the replacement cost of fuel, incremental operating costs (variable costs) and a pro rata share of fixed costs (constant costs). The staff concluded that the rates were reasonable as measured by that standard.

Richmond (Indiana) Power & Light, an electric utility, and Representative Michael J. Harrington of Massachusetts[6] objected to the proposed rates on various grounds, and the Commission instituted a rulemak-

---

**2.** *Nation-Wide Fuel Emergency* (Order No. 496), 50 F.P.C. 1691 (1973).

**3.** NEPOOL is a group of interconnected independent electric utilities. Power pools of this sort are described in text *infra* at note 28.

**4.** Experts distinguish between power, for which the utility receives reimbursement for fixed and all other costs, and energy, for which the utility is reimbursed only for fuel and variable costs. We do not limit our use of these terms to such technical understandings.

**5.** 16 U.S.C. § 824a(c) (1970), quoted *infra* note 17.

**6.** The Congressman purported to act on behalf of himself and his constituents, all potentially affected by coal-by-wire rates. For convenience, we shall more often refer to both Representative Harrington and Richmond Power & Light as "Richmond" even though each did not join in every contention with which we must deal.

ing proceeding.[7] Other interested utilities submitted undisputed data showing that the variable and constant costs allocated to this service equalled or exceeded the rates proposed. Richmond and the Commission's Office of Economics, however, protested the attribution of any fixed costs to the service. Richmond further complained of the Commission's failure to impose rates low enough for Adam Smith's invisible hand to dictate the use of coal by wire even after imported oil again became freely available. An aspect of this alleged error was the Commission's rejection of Richmond's requested "through" rate—a single joint rate for a transmission crossing two or more systems as opposed to individual rates for each utility or power pool involved in the transaction.[8] Richmond also disputed the Commission's refusal to direct intervening utilities to transmit—or wheel[9]—electricity from the supplier to the purchaser. Many of the parties responded to Richmond's attacks and disagreed with its conclusions.

By order of August 26, 1974, the Commission determined that the situation did not justify invocation of its emergency powers and granted NEPOOL's motion to withdraw its petition.[10] The Commission further found that fixed-cost recovery was proper and that the cost data it had re-

ceived fully supported the proposed rates.[11] Lastly, the Commission refused to compel utilities to wheel power.[12] On September 26, 1975, the Commission denied reconsideration of the points now in contention,[13] and petitioners seek our review.[14]

## II. THE COAL–BY–WIRE PROGRAM

### A. *NEPOOL's Petition for Emergency Relief*

 We must first analyze the Commission's decision to allow NEPOOL to withdraw its petition for emergency relief. Richmond is aggrieved by the Commission's refusal to invoke Section 202(c)[15] only if its emergency powers could have provided the sole authorization for the steps Richmond sought. Thus, unless the Commission incorrectly declined to declare an emergency, we must consider the remaining issues in light of the Commission's ordinary powers.

We encounter little difficulty in concluding that the Commission was well within its discretion. Richmond argues that NEPOOL never received all of the coal by wire it had originally requested and, although the embargo has long since ended, that the high cost and uncertain supply of imported oil continue to justify emergency measures. On the first point, the Commission pointed out that because the effects of the embargo

---

7. No party has challenged the propriety in this instance of determining rates through rulemaking. Cf. *FPC v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (rulemaking proper for setting rates under the Natural Gas Act).

8. Some pools voluntarily proposed through rates for transmissions cutting across the areas respectively served by their component utilities. Richmond, however, sought such rates for the entire transmission from the supplier to the ultimate recipient—not just for some portions of the journey.

9. Wheeling is broadly defined as the "transfer by direct transmission or displacement [of] electric power from one utility to another over the facilities of an intermediate utility." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 368, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359, 363 (1973). Because electricity in an activated system is always flowing, the transfer can be made by adding to the flow in one direction—true wheeling—or, if the transfer is in the opposite direction of the then-prevailing flow, by

reducing the flow from the receiving to the supplying utility by the amount required—displacement.

For convenience, we will usually refer to all "intermediate" utilities as "transmitting" utilities and to their service as "transmission." Similarly, we will refer to the end seller as the "supplier."

10. *New England Power Pool Participants, Coal-by-Wire*, 52 F.P.C. 410, 412 (1974) (Order of Aug. 26, 1974).

11. *Id.*

12. *Id.* at 420–422.

13. *New England Power Pool Participants, Coal-by-Wire* (Order of Sept. 26, 1975), Joint Appendix (J.App.) 936.

14. Pursuant to § 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b) (1970).

15. See note 17 *infra* for the text of § 202(c).

were less severe than expected NEPOOL received greater oil allocations than originally anticipated, that the coal-by-wire equivalent of 1.3 million barrels of oil was voluntarily supplied, and that NEPOOL never had to interrupt service.[16] The Commission insists that under these circumstances it did not abuse its discretion by settling upon a temporary-voluntary program, and we heartily agree.

Richmond's second contention, that dependence on imported oil leaves this country with a continuing emergency, compels no different result. We are fully mindful, of course, that current national policy is to discourage reliance on foreign oil, but we cannot fault the Commission for reading Section 202(c) as devoid of a solution. That section speaks of "temporary" emergencies, epitomized by wartime disturbances,[17] and is aimed at situations in which demand for electricity exceeds supply and not at those in which supply is adequate but a means of fueling its production is in disfavor.[18] The Commission's construction of Section 202(c) contravenes neither common sense nor any indication of legislative intent, and we are constrained to defer to the administrative interpretation.[19]

### B. *The Necessity of Considering National Policy On Foreign Oil*

 Richmond's major complaint is that the Commission erroneously limited the scope of its inquiry. The Commission explained its position in these words:

> These proceedings are not ones in which we are properly called upon to resolve broad questions of resource allocation, industry pooling structures and operating procedures, all as raised by the foregoing contentions. These fuel conservation power and energy transfers were consummated at the Commission's request to meet physical fuel shortfall conditions, not to affect economic conditions. The Commission contemplated that these transfers would be accomplished within the framework of the existing power pools and electric reliability councils.[20]

Since displacement of foreign oil with domestic energy is a national goal, Richmond

---

16. *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 8–12 (Order of Sept. 26, 1975), J.App. 943–947.

17. The exact language of the section is:

> (c) During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

16 U.S.C. § 824a(c) (1970).

18. See *S.Rep.No.621*, 74th Cong., 1st Sess. 19–20, 49 (1935).

19. See *Wilderness Soc'y v. Morton*, 156 U.S. App.D.C. 121, 143–145, 479 F.2d 842, 864–866 (en banc), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), comparing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965) (courts must yield "great deference to the interpretation given [a] statute by the officers or agency charged with its administration") with *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192, 199 (1970) (meaning of statutory terms must ultimately be resolved by courts and not by agencies).

In view of our conclusion that the Commission did not abuse its discretion by refusing to declare a § 202(c) emergency, we have no occasion to address the Commission's argument that such decisions are committed to agency discretion by statute and thus are judicially unreviewable.

20. *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 419–420 (Order of Aug. 26, 1974). In initiating the coal-by-wire effort, the Commission stated:

> The Commission does not view these requested actions as permanent long-term or in substitution for increased supplies of electric

argues that the Commission must consider incentives to the substitution of domestic fuels in reaching any decision that could have that effect. Specifically, Richmond posits that "fuel conservation" rates that do not lead to decreased consumption of foreign oil are ipso facto unreasonable.[21]

We disagree. Although the Commission must serve the public interest in approving rates, we see no abuse of discretion in limiting this proceeding to the shortrun problem of setting just and reasonable rates for the service theretofore provided in response to the 1973 oil embargo. While an administrative agency must remain faithful to public policies directly related to its regulatory authority,[22] surely at any given moment of

power and energy generated from non-petroleum and non-natural gas fuels. They are temporary expedients to meet current national fuel and energy conditions. *Nationwide Fuel Emergency* (Order No. 496), *supra* note 2, 50 F.P.C. at 1694.

**21.** Richmond did not seriously argue that the Commission should completely abandon such considerations as cost and instead set the rates at a level designed solely to assure transmission of a substantial amount of coal by wire. Thus we need not determine whether, under the Federal Power Act and the Fifth Amendment, the Commission could ever fix rates below allocable costs simply to further particular end uses or policies. Compare *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 617, 64 S.Ct. 281, 294–295, 88 L.Ed. 333, 353 (1944) ("[i]f the standard of 'just and reasonable' is to sanction the maintenance of high rates . . . because they restrict the use of natural gas for certain purposes, the Act must be further amended") and *Consolidated Gas Supply Corp. v. FPC*, 172 U.S.App.D.C. 162, 168, 520 F.2d 1176, 1184 (1975) ("we need not and do not rule on [the Commission's] authority to discourage end use when prescribing rates in a shortage situation").

**22.** Although we need not resolve the issue, one may doubt whether the goal of energy independence is within the Commission's regulatory jurisdiction at all. In *NAACP v. FPC*, the Court ruled that, although elimination of employment discrimination is "an important national goal," the Commission is not called upon to "advanc[e] the public interest in general"; "the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation." 425 U.S. 662, 665–666, 669, 96 S.Ct. 1806, 1809–1810, 1811, 48 L.Ed.2d 284, 288–289, 291 (1976). The Commission's principal purpose, the Court reminded, is the "orderly development of plentiful supplies of electricity and natural gas at reasonable prices." *Id.* at 670, 96 S.Ct. at 1811, 48 L.Ed.2d at 291 (footnote omitted).

Richmond does not argue for overall conservation of fuel, but instead urges that utilization of one fuel is preferable to another. Nor is there room in this case for argument that the Commission must encourage coal by wire because it bears more reasonable prices than does foreign oil. It would be circular to say that the Commission must consider setting low rates for coal by wire because if it does they will be below rates reflecting the cost of an equivalent amount of foreign oil.

Perhaps the answer is that the Commission may consider the energy-independence issue but, aside from its future relationship to potentially lower rates, is not necessarily required to do so. All the Act expressly mandates is that the Commission determine whether the rates are unjust, unreasonable or unduly discriminatory. Federal Power Act §§ 205–206, 16 U.S.C. §§ 824d–824e (1970). Another section of the Act, not directly applicable to this proceeding, deals with the Commission's duty to promote and encourage voluntary interconnection, and states that its purpose is to assure "an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources . . ." *Id.* § 202(a), 16 U.S.C. § 824a(a). From this expression of congressional intent, one might reason that the Commission is empowered to consider overall fuel-supply economics and the social consequences of energy shortages, but that it need not invariably do so if the rates are just and reasonable in the traditional regulatory sense and if the rate decision will not substantially impair the chances for achieving the goals of § 202(a) through the mechanisms of that section.

Nothing in *NAACP v. FPC, supra*, forecloses agency discretion to consider in given situations pervasive public policies that it is not required to evaluate in every decision it makes. But see Kennedy, *The Federal Power Commission, Job Bias and NAACP v. FPC*, 10 Akron L.Rev. 531, 537 (1977). If it is within an agency's discretion to consider furthering an asserted public interest, but if consideration of that interest is not demanded by the governing regulatory legislation, compare, *e. g., Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 614, 620 (2d Cir.), *cert. denied*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1965) ("[t]he Commission has an affirmative duty to inquire into and consider" all facts relevant to the decisionmaking standards imposed by the

history it may rationally decline to affirmatively foster other policies in weighing the specific interests that it is required by statute to consider.[23] This is especially true when the forum chosen by proponents of the other policy is not well suited to study of its implications.[24]

The goal of minimal use of foreign oil is predicated upon fear of overdependence and the concomitant danger of economic dislocation by an actual or threatened cutoff. This very dispute demonstrates, however, that as long as substantial excess capacity remains available in an emergency—and Richmond does not propose any lasting dedication of capacity—the Commission by

order or by persuasion can eliminate much of the need for oil in electrical generation. Thus the question of long-term displacement of imported petroleum could safely be left to later proceedings instigated by Richmond or the Commission itself, or indeed to resolution by Congress.[25]

Moreover, while the Commission rebuffed a more positive march toward the goal of decreased consumption of foreign oil, it also rejected the means suggested by Richmond for achieving that end as either inefficacious or statutorily prohibited. If that action was well founded, the Commission's failure to weigh the requested objective could hardly amount to error.[26] Thus, we

statutory scheme), or other "action-forcing" legislation, compare, *e. g.*, *Calvert Cliffs' Coordinating Comm. v. AEC*, 146 U.S.App.D.C. 33, 35, 449 F.2d 1109, 1112, 17 A.L.R. Fed. 1 (1971) (National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* (Supp. V 1975) "makes environmental protection a part of the mandate of every federal agency and department"), a refusal to exercise that discretion is reversible only if the discretion is thereby abused. And as long as contemplated action does not threaten to injure irreparably an interest subject to discretionary consideration, refusal to consider the interest would seldom be an abuse of discretion.

The Commission rejected a less circular argument—that it should do more to encourage coal by wire because it was less costly than foreign oil—on the ground that, with "decreasing fuel inventories and escalating prices for coal," coal by wire "did not materialize in 1974 as a source of low-cost 'non-emergency' power and energy for New England." *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 20 (Order of Sept. 26, 1975), J.App. 955. This conclusion was within the Commission's expertise and was supported by undisputed data in the record. Richmond's present argument differs in that it proposes that the Commission should set rates low, even below cost, simply on the ground that they would therefore be low.

23. Cf. *City of Lafayette v. SEC*, 147 U.S.App. D.C. 98, 110, 454 F.2d 941, 953 (1971), *aff'd*, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973) (discussing "the requirement of a reasonable nexus between the activities challenged and the activities furthered by the application").

24. *NOW v. FCC*, 181 U.S.App.D.C. 65, 74, 555 F.2d 1002, 1011 (1977) ("industry-wide problem may be more appropriately aired and an industry-wide remedy formulated in a general in-

quiry"); see note 60 *infra* and accompanying text. For example, in *Aberdeen & R. R. R. v. SCRAP (SCRAP II)*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Supreme Court noted that "standard ratemaking criteria limit the power of the [Interstate Commerce Commission] to force railroads to transport recyclable materials at deficit rates no matter how much the environment would be benefited thereby . . . ." *Id.* at 323 n.21, 95 S.Ct. at 2357 n.21, 45 L.Ed.2d at 217 n.21. And the Court went on to conclude that "no purpose could have been served by ordering [the Commission] to thoroughly explore the question in the confined and inappropriate context of a railroad proposal for a general rate increase when it was already doing so in a more appropriate proceeding." *Id.* at 325, 95 S.Ct. at 2358, 45 L.Ed.2d at 218.

25. We note that the question whether long-term usage of fuel by wire is in the public interest is not an easy one. Besides issues of fuel cost and feasibility under existing interconnection systems, see note 30 *infra* and accompanying text, power losses incurred in lengthy transmissions are substantial and might be unacceptable if more than temporary. J.App. 65 (conference statement by Mr. Blinn of NEPOOL) ("this does not appear to be a very efficient way of using national energy resources"). Additionally, persons living near coal-fired utilities may be subjected to an enduring degradation of their environment in order to provide electricity for individuals breathing unpolluted air hundreds or thousands of miles away. And study is just beginning on possible dangers from high voltage bulk transmission lines.

26. The Commission's reliance on the inefficacy of Richmond's means as a rationale for not considering the goal of foreign-oil replacement

turn to the specifics of Richmond's proposals.

C. *Through Rates*

Richmond's most imaginative demand was that the Commission modify the proposed schedules by the substitution of "through" transmission rates for coal-by-wire transactions. An understanding of this proposition requires some knowledge of the national electrical interconnection system, and thus we offer a brief explanation.

The United States is divided into a number of regions for purposes of interconnection.[27] Many parts of the country are served by formal power pools, made up of interlinked utilities contracting to shunt electricity back and forth as needed.[28] Each such pool has a central dispatcher in charge of interutility transfers and transmissions[29] to other contiguous systems. Interpool transactions require a high degree of coordinated effort. NEPOOL, for example, might request electricity from the adjoining New York Power Pool (NYPP), which might fill the order and replace its surrendered energy by a transmission from the neighboring Pennsylvania-New Jersey-Maryland Interconnection (PJM). If PJM does not wish to start up oil-fired generators for that purpose, it may seek a transmission from the Allegheny Power System, located to the west. This process, which Richmond derisively labels a "daisy-chain," continues until it reaches a utility willing to employ its excess capacity to complete—or, from its perspective, to begin—the transaction. That utility is the supplier, and all intervening utilities are engaged in "wheeling" of electricity.

Such transfers normally occur at night or on weekends, when suppliers are more likely to have underused turbines and power lines. Traditionally, and under the schedules approved by the Commission, each utility or pool pays its neighbor for the service provided; a particular coal-by-wire transmission can involve four or more individual charges. If no supplier can be found or any needed intervening utility refuses to wheel, the entire transmission will fail. Quite understandably, no one lacking excess capacity is generally disposed to give power up until assured of a replacement amount from someone else.

is not immediately apparent but is discernible. In discussing its refusal "to resolve broad questions of resource allocation," the Commission specifically noted that "[a]n explanation of industry operational structure and practices, as they presently exist, will be helpful to understanding of why we do not, and can not, accept" Richmond's concepts. *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 419–420 (Order of Aug. 26, 1974).

27. Federal Power Commission, The 1970 National Power Survey I–17–16 (1971).

28. As the Commission described it:

The electric power supply systems in the eastern, southern and midwestern regions of the United States normally operate together in a synchronous manner to form a series of large interconnected electric power grids. Geographically, these interconnected systems extend from Maine to Florida and inland as far as Oklahoma, Nebraska and the Dakotas and include most power facilities in seven of the nine electric reliability councils. The far·western states tend to operate as a separate series of power grids with weaker ties to the East. The interconnected systems in most of Texas operate as an electrically isolated power grid. Ownership of components of these systems is divided among investor owned utilities, agencies of the Federal Government and various publicly owned utility organizations and cooperatively owned systems. System reliability is accomplished under this Commission's administratively established adequacy and reliability program pursuant to Section 202(a) of the Federal Power Act, and Order series 383, the latest being Order No. 383–3, 49 FPC 700 (1972). This program is voluntary, but it is the policy of the Commission that all electric systems shall have the opportunity to participate in the adequacy and reliability matters consistent with their needs. See Order series 383.

*New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 420–421 (Order of Aug. 26, 1974). Some areas of the country not as directly involved in this proceeding have less formal coordination arrangements. See The 1970 National Power Survey, *supra* note 27, at I–17–10.

29. See note 9 *supra* for an indication of the physical methodology of interpool and interutility transfer.

Richmond proposed a single through rate for transmissions crossing multiple utilities or systems, with the participants later dividing the payment. This, it was argued, would allow supplier and ultimate purchaser to engage in "face-to-face" dealings and thus encourage use of coal by wire. Nonetheless, as the Commission pointed out, coordination is essential to assure balanced loading of transmission lines and consequently to avoid disruptions and blackouts.[30] Unavoidably, then, each dispatch center must communicate directly with its neighbor in any case.

■ Moreover, as Richmond admits,[31] through rates would be feasible only if the Commission could order all intervening utilities to wheel electricity; a bundle of electrons ordered by a purchaser simply cannot be put in the mail by a supplier. And such a rate would be advantageous to purchasers only if it were lower than the sum of the individual rates. Since purchasers are always free to subscribe to the services of willing utilities at the separate rates, the Commission's failure to establish through rates can be deemed arbitrary only if the individual rates were unjustly or unreasonably high and, as well, the utilities had a duty to wheel. Richmond separately contended for both of these propositions, to which we turn next.

### D. Authority to Require Wheeling

■ No one now argues that the Commission has authority to mandate wheeling. As the Supreme Court recently held, the legislative history precludes that result:

As originally conceived, Part II [of the Federal Power Act] would have included a "common carrier" provision making it "the duty of every public utility to . . transmit energy for any person upon reasonable request. . . ." In addition, it would have empowered the Federal Power Commission to order wheeling if it found such action to be "necessary or desirable in the public interest." H.R. 5423, 74th Cong., 1st Sess.; S. 1725, 74th Cong., 1st Sess. These provisions were eliminated to preserve "the voluntary action of the utilities." S.Rep.No.621, 74th Cong., 1st Sess., 19.

It is clear, then, that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships.[32]

As we have indicated, both Richmond and Representative Harrington originally urged the Commission to directly order wheeling.[33] As the Congressman put it, he would have " 'require[d] utilities to transmit power along their lines if capacity [was] fully available' " because "past reliance on voluntary interconnection and coordination of facilities (Section 202(a)) by areas within the United States has not produced a rational power system . . . ."[34] Whether or not one is impressed by the possible benefits of a fully integrated national power grid,[35] it is clear that Representative Harrington's arguments are better directed to his congressional colleagues than to the Commis-

---

**30.** *New England Power Pool Participants, Coalby-Wire, supra* note 10, 52 F.P.C. at 421–422 (Order of Aug. 26, 1974); accord, *id.* at 420 ("the operational and electrical dispatch changes which would be required to implement a Nation-wide spot market in bulk power supply, can not be performed in the electrical control and operating equipment which is now in place . . ."; "[u]nless proper controls and procedures are in use in a power pool, there will be system disturbance or blackouts on a regular basis"). See also *id.* at 413 n.4; *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 19 (Order of Sept. 26, 1975), J.App. 954.

**31.** Brief for Petitioners at 36–38, 47.

**32.** *Otter Tail Power Co. v. United States, supra* note 9, 410 U.S. at 374, 93 S.Ct. at 1028, 35 L.Ed.2d at 366.

**33.** *E. g.,* Application for Rehearing by Richmond Power & Light (Sept. 25, 1974), at 3, J.App. 922; Comments of Richmond Power & Light (May 24, 1974), at 5, J.App. 591.

**34.** Application for Rehearing by Congressman Michael J. Harrington (Sept. 25, 1974), at 5, J.App. 916 (citation in original).

**35.** See generally The 1970 National Power Survey, *supra* note 27, at I–17–29 to I–17–30; S. Breyer & P. MacAvoy, Energy Regulation by the Federal Power Commission 91–97 (1974).

sion, for only Congress can change what has been wrought by Section 202(a).[36]

In this court Richmond seeks the same end through less direct means. Since the Commission may reject unreasonable rate proposals and fix acceptable rates instead,[37] and since the utilities submitted to the Commission rates for voluntary wheeling, Richmond asserts that the Commission must have the power to condition its approval of those rates on continued, albeit involuntary, wheeling. This logic is superficially persuasive; the Commission does have authority to impose requirements and conditions "necessary or appropriate to promote the policies" of the Act.[38] But such conditions may not contravene the Act, and the reasoning of Richmond's unstated minor premise, as we now explain, seeks to achieve exactly that.

Richmond assumes that the proffered rates were unreasonable because they did not guarantee that utilities will wheel. Yet Congress' as-yet unamended purpose was to indulge utilities that very freedom.[39] If Congress had intended that utilities could inadvertently bootstrap themselves into common-carrier status by filing rates for voluntary service, it would not have bothered to reject mandatory wheeling in favor of a call for just such voluntary wheeling. What the Commission is prohibited from doing directly it may not achieve by indirection.[40]

### E. Recovery of Fixed Costs

■■■■■ On more traditional grounds, Richmond attacks the inclusion of fixed costs in the Commission's transmission rate calculations.[41] The rationale is that fuel conservation service is in practice largely confined to nights and weekends and thus uses idle capacity, and that transmitting utilities do not dedicate capacity but rather can terminate transmissions on short notice. Thus Richmond would predicate the rates on variable costs because the service would not require the building of new facilities with accompanying fixed costs. Richmond also argues that fixed costs are fully reflected in the utilities' other rate schedules and that pro rata inclusion here would produce a windfall for them.

Richmond's contentions obviously would be doomed to failure had it succeeded in persuading the Commission to develop long-term fuel conservation measures featuring mandatory wheeling. Had that been done, and once such transfers became commonplace, utilities expectably would build new facilities to assure an adequate safeguard of excess capacity for their regular customers;[42] fixed costs would thus become closely related to the service in question. The same response—and the same result— might be anticipated if long-term, large-scale voluntary wheeling became predicta-

**36.** The Commission has been criticized for not doing enough to promote national coordination, S. Breyer & P. MacAvoy, *supra* note 35, at 119, but that is not the challenge presented by Richmond in this case.

**37.** See Federal Power Act § 206, 16 U.S.C. § 824e (1970).

**38.** *Cf. Elizabethtown Gas Co. v. FERC*, 188 U.S.App.D.C. ——, ——, 575 F.2d 885, ——, (D.C.Cir. Jan. 26, 1978), at 888.

**39.** See text *supra* at note 32.

**40.** *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 14 (Order of Sept. 26, 1975), J.App. 949; *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 422 (Order of Aug. 26, 1974); *cf. City of Paris v. FPC*, 130 U.S.App.D.C. 250, 252 n.2, 399 F.2d 983, 985 n.2 (1968).

**41.** *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 5–6 (Order of Sept. 26, 1975), J.App. 940–941. Curiously, while Richmond wanted the rates for transmitting utilities to be based solely on incremental costs, it felt that supplying utilities—such as itself— should also receive "such adder as will contribute to fixed costs and return to the extent the Commission determines necessary to maximize the flow of conservation energy . . . ." Application for Rehearing by Richmond Power & Light, *supra* note 33, at 2–3, J.App. 921–922. See also *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 15 n.17 (Order of Sept. 26, 1975), J.App. 950 n.17.

**42.** See J. Bonbright, Principles of Public Utility Rates 321–322 (1961); *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 421 (Order of Aug. 26, 1974).

ble. The Commission, however, has for now rejected coal by wire as more than a temporary expedient, and accordingly must justify the rates in light of the sporadic and transient nature of the service.

Without debating the logic behind the inclusion of fixed costs in situations of this sort, we must say that in this case the Commission has reached an informed and reasoned decision.[43] We might observe generally that the science of utility ratemaking may not be so exact that, even if it were the rule that "reasonable" rates must be strictly cost-related, the allocation of fixed costs to short-term use of otherwise excess capacity could be considered unquestionably arbitrary.[44] We need not reach that issue, however, because we find that it

43. *Public Serv. Comm'n v. FPC*, 167 U.S.App. D.C. 100, 107, 511 F.2d 338, 345 (1975) (reviewing court must assure Commission gave "reasoned consideration to the material factors" and that "substantial evidence [supports] each of the essential elements of the agency's actions"); *Macdonald v. FPC*, 164 U.S.App.D.C. 248, 256–258, 505 F.2d 355, 363–365 (1974); *City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

We are not entirely pleased with the Commission's discussion of the economic principles operable in this situation. Although we can perceive the path to its conclusion on allocable costs, and although its choice of route was not unreasonable, we can also see that the Commission stumbled down the trail it had chosen. Irrespective of the direction in which the Commission *ultimately heads, it could travel a* smoother road if it would lay out the competing principles of ratemaking, explain why it accepts particular theories and rejects others, and then elucidate how the principles adopted support the specific allocation of costs. Such an explication would not only aid our review but, we believe, would lead to better informed and better reasoned decisions by the agency itself.

44. See *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206, 1215–1216 (1945). See generally J. Bonbright, *supra* note 42, at 323 (short-run incremental costs have serious defects as basis for sound rate differentiation); *id.* at 326 (distinction between constant costs and variable costs is artificial though useful).

The Commission's *Atlantic Seaboard* rate formula for jurisdictional pipelines allocated 50% of fixed costs to the commodity component of a two-part—demand and commodity—rate design. *Atlantic Seaboard Corp.*, 11 F.P.C. 43 (1952). Although this apportionment does not coincide with pure system-peak responsibility pricing it has garnered judicial approbation, *State Corp. Comm'n v. FPC*, 206 F.2d 690, 709–710 (8th Cir. 1953), *cert. denied*, 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954), and has been generally followed for many years. The Commission's justification of the resulting rate relies on fairness and value-of-service considerations. See *Atlantic Seaboard Corp.*, *supra*, 11 F.P.C. at 53–56; J. Bonbright, *supra* note 42, at 354 n.16. In a recent decision, we approved a further shift of fixed costs to the commodity component as a just and reasonable pragmatic judgment in light of gas shortages and unused pipeline capacity. *Consolidated Gas Supply Corp. v. FPC*, *supra* note 21. See also *Colorado Interstate Gas Co. v. FPC*, *supra*, 324 U.S. at 615, 65 S.Ct. at 845, 89 L.Ed. at 1229 (Jackson, J., concurring) ("I do not think it can be accepted as a principle of public regulation that industrial gas may have a free ride because the pipe line and compressor have to operate anyway"); *id.* at 591, 65 S.Ct. at 834, 89 L.Ed. at 1217 (majority opinion) ("considerations of fairness, not mere mathematics, govern the allocation of costs"); *FPC v. Texaco, Inc.*, *supra* note 7, 417 U.S. at 387, 94 S.Ct. at 2321, 41 L.Ed.2d at 150 ("[t]hat every rate of every natural gas company must be just and reasonable does not require that the cost of each company be ascertained and its rates fixed with respect to its own costs"); *Public Serv. Comm'n v. FPC*, 170 U.S.App.D.C. 153, 156, 516 F.2d 746, 749 (1975) (implying that cost is not necessarily the only secure foundation for ratemaking).

The rates set in this proceeding apply to service performed during the 1973 oil embargo, and the schedules that would otherwise have been applicable were as high or higher. *New England Power Pool Participants, Coal-by-Wire*, *supra* note 10, 52 F.P.C. at 416 (Order of Aug. 26, 1974). The Commission indicated that post facto prescription of rates based solely on incremental costs would discourage voluntary efforts to solve future fuel crises:

[W]e accept the settlement rates and charges as a reasonable compromise between the opposing interests on rate design principles and policy and we accept them for filing . . . for the additional purpose of making Fuel Conservation Service fully effective on a *voluntary* basis. The rates and charges in the case of Section 202(c) *Commission-directed* 'emergency' energy transfers shall be governed by the principles set forth in our Regulations Section 32.62E.

*New England Power Pool Participants, Coal-by-Wire*, *supra* note 13, at 18 (Order of Sept. 26, 1975), J.App. 953 (emphasis in original); see note 52 *infra* (discussion of the Commission's general emergency regulations). Thus, we cannot see that the Commission has ignored relevant considerations or has misused those

was within the Commission's discretion to conclude that Richmond's off-peak pricing theory was unacceptable on the facts of this case.[45]

Although the utilities could cancel out on short notice, coal-by-wire service involved reservations of identifiable facilities.[46] More importantly, transmitting systems such as PJM showed that their participation would often levy maximum loads on their facilities, thus imposing a ceiling on increased service to their standing customers, although supplying utilities might not be operating at capacity.[47] And, as the Commission noted, even if some of the same fixed costs had already been allocated through another rate schedule, coal-by-wire transmission service should not be given a "free ride"; both federal and state regulatory agencies could always order corresponding changes in the rates for the utili-

ties' normal consumers.[48] This arrangement seems in accord with Congress' refusal to compel utilities to function as common carriers and its manifest intent that they meet their local obligations first.[49]

To summarize, we find that substantial evidence supports the Commission's actions and that the rates approved fall within the statutorily-mandated zone of reasonableness.[50] The Commission specifically left open the possibility of applying off-peak cost allocation methods when warranted,[51] and in a separate rulemaking proceeding not here under challenge gave broader study to the theoretical principles generally applicable to rates in fuel-by-wire transactions.[52] We think no more was required.

## III. DISCRIMINATION

One last and analytically separate issue remains. Richmond has used

upon which it relied. "[I]n the end it [is] for the Commission, not us, to evaluate the respective justifications put forth on the record, and to choose between two divergent theories . . . ." *City of Cleveland v. FPC*, 174 U.S. App.D.C. 1, 5 n.36, 525 F.2d 845, 849 n.36 (1976), *mandate enforced*, 182 U.S.App.D.C. 346, 561 F.2d 344 (1977).

45. See *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600, 609–610 (1972).

46. *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 413–414 (Order of Aug. 26, 1974); see *id.* at 419 (coal-by-wire service was prescheduled and was used to replace capacity of receiving utilities).

47. *Id.* at 417; *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 16 (Order of Sept. 26, 1975), J.App. 951. PJM's major demand comes from the urban corridor on the eastern border of its system. Its base load is primarily handled by minemouth units located to the west. Units in the cities are used during peak periods to meet the increased demand. Thus major west-to-east transmission lines are heavily loaded at all times. Of course, not all systems share this characteristic, although they all received rates based in part on fixed costs. This points up a potential defect in the use of rulemaking instead of individual adjudications in setting rates. The Commission should be wary of serious over-generalizing through rulemaking, but no one has raised a protest in this proceeding. See *FPC v. Texaco, Inc., supra* note 7, quoted in note 44 *supra*.

48. *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 16–17 (Order of Sept. 26, 1975), J.App. 951–952.

49. State agencies submitting comments argued that the primary duty of utilities is to serve in-state ratepayers and not to give a "free ride" to consumers outside the service area. *E. g.*, Letter from Public Service Commission of Indiana (Jan. 31, 1974), at 1–2, J.App. 109–110.

50. See *FPC v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626, 633 (1976).

51. The Commission made clear that it was not implying "that such cost allocation methods would be appropriate in the future . . . ." *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 412 (Order of Aug. 26, 1974).

52. At the time of its initial order of August 26, 1974, the Commission initiated a proceeding to establish regulations to govern procedures and rates for emergencies declared under § 202(c). 39 Fed.Reg. 31654 (1974). In response to extensive comments by parties including Richmond and Representative Harrington, the Commission ruled that should it be forced to set rates for service provided in future emergencies it would predicate those for non-firm service either on incremental costs or on a share-the-savings theory. 39 Fed.Reg. 42903, 43910–43911 (1974), *reconsideration denied*, 40 Fed. Reg. 5142 (1975). A petition for review of that rulemaking proceeding in this court was dismissed by agreement of the parties.

these proceedings as a forum for its complaint of the alleged refusal of the American Electric Power System (AEP)—the Nation's largest—and its affiliate, Indiana & Michigan Electric Co. (I&M), to wheel Richmond's excess energy to coal-by-wire customers. Viewing itself, perhaps correctly, as David battling Goliath, Richmond argues that AEP and I&M are guilty of unlawful discrimination because they decline to transmit its power and instead wheel higher-priced electricity of another AEP member.[53]

With contract negotiations ongoing between Richmond and I&M, the Commission's order of August 26, 1974, referred the dispute to the Department of Justice and the Securities and Exchange Commission, and concluded that the parties should reconsider their positions in light of its rulings on Richmond's other contentions.[54] The Commission also expressly held out "the opportunity to seek further Commission consideration and resolution of any remaining unresolved issue within the Commission's regulatory jurisdiction. . . . If there are then any outstanding unresolved issues within the Commission's regulatory jurisdiction, they will be set for hearing by a future Commission order."[55]

Richmond's only response was to argue that

[t]he Commission has failed, and is failing, to order relief for Richmond which would assure that I&M will in fact purchase Richmond energy on a non-discriminatory basis, that I&M will provide transmission service for Richmond's available energy not purchased by I&M, and that I&M will sell to and transmit to Richmond conservation energy in the event of a coal shortage, at least on the same basis it provides such services to other utilities, and on the same basis such services are supplied among and between the AEP affiliates.[56]

Thus Richmond spurned the opportunity to demonstrate that particular activities were unreasonably anticompetitive or discriminatory and claimed instead that the mere failure to wheel energy to and from Richmond while wheeling for any other utility was unlawful discrimination.[57] With the issue thus narrowed, the Commission correctly ruled that since Congress made wheeling voluntary an individual decision to wheel for one customer but not for another is not automatically discriminatory.[58] This rejection of a per se rule follows logically from the congressional refusal to impose common-carrier duties on electric utilities.[59]

**53.** Richmond is not complaining of unjustifiable discrimination in I&M's rates, an injury which the Commission would have a duty to rectify. Compare *Towns of Alexandria v. FPC,* 181 U.S.App.D.C. 83, 91, 555 F.2d 1020, 1028 (1977) discussing Federal Power Act § 205(b), 16 U.S.C. § 824d(b) (1970).

**54.** *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 424 (Order of Aug. 26, 1974).

**55.** *Id.* at 424–425. We see nothing erroneous in the Commission's characterization of Richmond's position at that stage—"that its broad questions on restructuring the industry must be resolved first." *Id.* at 423.

**56.** Application for Rehearing by Richmond Power & Light, *supra* note 33, at 10, J.App. 929.

**57.** We are not faced with a claim that I&M's failure to utilize its transmission capability fully or to purchase less expensive electricity for wheeling resulted in unnecessarily high jurisdictional rates. Compare *Niagara Mohawk*

*Power Corp. v. FPC,* 538 F.2d 966, 971 (2d Cir. 1976). I&M had contemporaneous rate hearings pending, but Richmond refused to air its complaints in that proceeding. See *New England Power Pool Participants, Coal-by-Wire, supra* note 10, 52 F.P.C. at 423 (Order of Aug. 26, 1974).

**58.** *New England Power Pool Participants, Coal-by-Wire, supra* note 13, at 15 (Order of Sept. 26, 1975), J.App. 950.

**59.** See text accompanying note 32 *supra* (Congress rejected common carrier role for electric utilities). Compare *American Trucking Ass'ns v. Atchison, T. & S. F. Ry. Co.,* 387 U.S. 397, 406, 87 S.Ct. 1608, 1613–1614, 18 L.Ed.2d 847, 854 (1967) ("[f]rom the earliest days, common carriers have had a duty to carry all goods offered for transportation") and *Trailways of New England v. CAB,* 412 F.2d 926, 931 (1st Cir. 1969) ("right to be treated fairly and non-discriminatorily by a common carrier . . . is one derived from the common law of common carriers" (footnote omitted)).

Thus Richmond had an obligation, which it failed to meet, of presenting a *prima facie* case that I&M's actions were the result of anticompetitive intentions or, perhaps, were at least unreasonable.

Had Richmond made such a presentation, we would still be far from certain that the Commission's deferral of further consideration to a separate proceeding would have been error. Agencies have wide leeway in controlling their calendars,[60] and Richmond was not complaining that any term of the approved schedules was itself anticompetitive.[61] Richmond would have had to prove its allegations of undue discrimination in one arena or another, and we perceive no appreciable disadvantage to Richmond in consequence of the course that the Commission invited it to pursue.

### IV. CONCLUSION

Although the objectives that Richmond has sought to realize in this ratemaking proceeding may have some merit, we remain convinced that on the whole the Commission dealt with them in a manner consistent with its statutory discretion. We are not at liberty to substitute our judgment for the judgment of the Commission. The orders reviewed herein must accordingly be affirmed.

*So ordered.*

---

**60.** *City of San Antonio v. CAB*, 126 U.S.App. D.C. 112, 115, 374 F.2d 326, 329 (1967).

**61.** Compare *City of Huntingburg v. FPC*, 162 U.S.App.D.C. 236, 498 F.2d 778 (1974) (rate schedules embodied agreements containing apparently anticompetitive provisions).