MUNICIPALITIES OF GROTON et
al., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

NEPOOL Executive Committee,
Intervenor.

NEPOOL EXECUTIVE COMMITTEE,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Municipalities of Groton et
al., Intervenor.

Nos. 76–2003, 76–2087.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 14, 1978.

Decided Oct. 19, 1978.

Charles F. Wheatley, Jr., Washington, D.
C., with whom Grace Powers Monaco and
Robert A. O'Neil, Washington, D. C., were
on the brief for petitioners in No. 76–2003.

James R. McIntosh, Hartford, Conn., for
petitioners in No. 76–2087 and Intervenor in
No. 76–2003.

Howard E. Shapiro, Washington, D. C.,
for respondent. Drexel D. Journey, Gener-
al Counsel, Robert W. Perdue, Deputy Gen-
eral Counsel, Allan Abbot Tuttle, Solicitor
and Scott M. DuBoff, Attorney, Federal
Energy Regulatory Commission, Wash-
ington, D. C., were on the brief for respon-
dents.

Before ROBINSON, MacKINNON * and
ROBB, Circuit Judges.

Opinion for the Court filed by ROBB,
Circuit Judge.

* Circuit Judge MacKINNON did not participate in the decision of this case.

ROBB, Circuit Judge:

Pursuant to several provisions of the Federal Power Act,[1] 16 U.S.C. §§ 791a *et seq.*, the Federal Energy Regulatory Commission began an investigation of the New England Power Pool (NEPOOL) Agreement. The agreement effects a comprehensive interconnection and coordination arrangement among numerous New England utilities. Its objective is to achieve greater reliability and economies in the production of electricity. Section 202(a) of the Act sanctions and encourages these voluntary pooling agreements,[2] but counsel informs us that this agreement is unique because of its breadth.

The purpose of the Commission's investigation was to determine whether any rate, charge or classification made in connection with a jurisdictional sale or transmission of power, or any rule, practice or contract relating thereto, was unjust, unreasonable or unduly discriminatory. The Administrative Law Judge found the agreement lawful. *New England Power Pool Agreement*, Docket No. E–7690 (Nov. 24, 1975), at J.A. 601. On review the Commission affirmed the ALJ in large part, reversing his findings with respect to only sections 9.4(d) and 9.5 of the agreement. *New England Power Pool Agreement*, Docket No. E–7690 (Sept. 10, 1976), at J.A. 651. The Commission found these two provisions unduly discriminatory and ordered that section 9.4(d) be modified and that section 9.5 be eliminated. Applications for rehearing were denied.

In No. 76–2003 nine municipalities of Connecticut and Massachusetts that own electrical systems petition for review of the Commission's order. They contend that the Commission erred in not finding the agreement discriminatory and anticompetitive in several other respects. In No. 76–2087 the Executive Committee of NEPOOL seeks review of that portion of the order finding section 9.4(d) unlawful. We believe however that the Commission has acted reasonably and accordingly dismiss the petitions for review.

## THE MUNICIPALITIES' PETITION

The municipalities' chief objection is that the agreement fails to provide for "firm power" transfers. Under firm power sales, a utility promises to transmit to a wholesale distributor a specified amount of power with the same level of reliability as is provided in the utility's retail service. In contrast, under a "unit power" sale—for which the agreement does provide—a utility promises to deliver a certain portion of its production from a particular generating unit; if the unit is not operating no power is dispatched.

The municipalities contend that the agreement's failure to provide for firm power sales is discriminatory and anticompetitive. They premise their allegation of discrimination on the Commission's finding

---

1. The proceeding was undertaken pursuant to sections 202, 205, 206 and 306–309 of the Act.

2. Section 202(a) provides:
    For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnected and coordinat-

ed electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts
. . .
Congress' intention in adopting this provision is explained in Senate Report No. 621, 74th Cong., 1st Sess. (1935) at p. 49:
    Under this subsection the Commission would have authority to work out the ideal utility map of the country and supervise the development of the industry toward that ideal. The committee is confident that enlightened self-interest will lead the utilities to cooperate with the commission and with each other in bringing about the economies which can alone be secured through the planned coordination which has long been advocated by the most able and progressive thinkers on this subject.

that there were no "overly compelling . . . substantive or technical reasons to exclude firm power transmission." (J.A. 681) The Commission added the finding that the form of the transaction was not recognized until after the power was delivered and then only in regard to the bookkeeping required under the agreement. Because the types of transmission were thus found to be largely indistinguishable, and because firm power sales are allegedly economically advantageous to small utilities, the municipalities argue that the failure to include firm sales unduly discriminated against small utilities.

Failure to include a provision guaranteeing firm sales is anticompetitive, the municipalities urge, because in the absence of such a provision the large, investor-owned utilities will refuse to enter into firm power contracts voluntarily. The municipalities also regard the NEPOOL billing apparatus as a disincentive to participants wishing to sell power under firm sale contracts.

The ALJ and the Commission considered these contentions of the municipalities. The ALJ stressed that as a voluntary agreement, which had been the product of extensive negotiations, the NEPOOL pact could not be expected to incorporate every provision that each party desired. Similarly, the Commission emphasized the voluntary nature of the agreement. Additionally, at one time the agreement proposed to provide firm power wheeling, the Commission observed, but that provision was intertwined with the concept of "pool supported transmission facilities" (PSTF). PSTF was an economically complex proposal to integrate transmission lines to form a regional bulk transmission grid financed completely by the participants. The parties however were unable to agree on how costs were to be shared and the concept, along with firm sales, was abandoned. Consequently, the Commission declined to infer any discriminatory or anticompetitive intentions from the exclusion of firm sales.

Nor was the Commission willing to find that the exclusion of firm power sales had a discriminatory or anticompetitive effect.

The Commission reasoned that failure to include every possible service, even one potentially benefiting only certain participants, was not discriminatory so long as those services offered were extended evenly to all participants. The Commission concluded moreover that the record revealed no undue diminution of competition:

> Although it appears that NEPOOL might narrow the basis for wholesale competition in that it will reduce the differences in bulk power supply costs and permit joint generating unit participation, (Tr. 465) reduction in cost of service resulting from this new-found coordination is most certainly in the public interest and outweighs any possible reduction in wholesale competition. Furthermore, NEPOOL should substantially increase all participants' available alternatives for access to generation and transmission facilities, (Tr. 1756-1757) and this eventuality should have a favorable impact upon competition.

*New England Power Pool Agreement,* Docket No. E-7690 (Sept. 10, 1976), at 33. (J.A. 683) In addition, the Commission noted, the agreement does not prohibit participants from entering into firm sales, so that such sales could continue to be negotiated as they had been in the past.

We think that the Commission's actions are the product of reasoned decisionmaking. Its conclusion that the agreement was not unduly discriminatory is reasonable in light of the voluntary nature of this agreement. Furthermore, the Commission and the ALJ both concluded that there was no evidence in the record to support the predatory and discriminatory allegations made by the municipalities. The Commission, however, did note in its orders that the participants have indicated that they were still considering PSTF and firm sales. It urged them to continue to explore the idea of firm power wheeling, and cautioned that it would later scrutinize NEPOOL operations in order to reassess the feasibility of shifting to PSTF and firm sales as experience under the agreement is gained. This

approach is reasonable,[3] we believe, and the municipalities' petition for review is therefore dismissed.

## THE COMMITTEE'S PETITION

The Executive Committee challenges the Commission's finding that section 9.4(d) of the agreement is unduly discriminatory. Section 9 requires each participant to maintain a prescribed level of generating capacity, termed "capability responsibility", which represents its proportionate share of the pool's peak load. Should a participant's generating capability fall below this level,

section 9.4(b) imposes an "adjustment charge" of $22.00 for each kilowatt year a participant is short. Section 9.4(d) exacts an additional charge, called a "deficiency charge", if the participant's system capability falls below its capability responsibility by more than one percent. This deficiency charge is intended to encourage participants to maintain their required levels of generating capacities, and it is computed on an increasing scale directly proportional to the percentage by which a participant's system capability is below its capability responsibility.[4] Thus, for example, a partici-

---

3. The municipalities also raise several lesser contentions. They contend that the Commission erroneously placed on them the burden to show that the agreement was unlawful. This burden was placed on them because the Commission considered the filing to be an initial rate filing. The municipalities contest this characterization on the ground that the NE-POOL agreement superseded an earlier filed temporary agreement, but we believe that the Commission's determination—based on the significantly broader purposes and scope of the NEPOOL agreement—was reasonable. Moreover, the Commission said that its approval of the agreement was based not on the municipalities' failure to meet their burden but on the substantial evidence in the record taken as a whole.

The municipalities also attack the legality of section 13 of the agreement, which governs the pool transmission facilities (PTF). Section 13 designates as PTF those transmission lines that are rated at or above 69 KV and necessary for power from significant sources to move unobstructed over the New England network. Section 13.1 makes one exception and grants PTF status to lines below 69 KV that are connected to a generating unit with a capacity of at least 25 MW. The municipalities contend that pegging the exception to 25 MW is discriminatory. The Commission, however, found that the 25 MW limit has not been shown to burden small participants unreasonably and that lowering or eliminating the 25 MW threshold would result in the designation as PTF of lines that serve only local loads and are unnecessary for the flow of power over the regional grid. The Commission's conclusion has not been shown to be factually wrong and has a reasonable basis. Accordingly, we sustain it.

The municipalities also assail sections 13.7 and 13.8. Section 13.7 entitles a participant to connect to another participant's non-PTF line in order to wheel power from the PTF. The section does not specify the rate for this wheeling, leaving that for the parties to negotiate. The municipalities allege that this causes finan-

cial uncertainty for small municipalities and will permit the owners of the non-PTF lines to charge unjust rates. The Commission, however, found that there was no support for these allegations and it noted that these rates are subject to its jurisdiction and must be just and reasonable. Section 13.8 permits a non-interconnected participant to connect with the PTF, subject to the consent of the participant who owns the segment where the interconnection is to occur. Although the municipalities allege that the owners of these segments will arbitrarily withhold their consent, the Commission found that there was no factual basis for such a conclusion. It warned, however, that it would "not countenance the unreasonable withholding of consent to interconnect and will act expeditiously upon any application for [mandatory] interconnection under Section 202(b)." (J.A. 679) We believe the Commission's refusal to act on the municipalities' unsubstantiated allegations is reasonable.

The municipalities' last objection is that they as a group are entitled to the "single participant" status accorded to the Vermont utilities and to systems comprising a single holding company. The subpooling permitted by such status allows a group of utilities to benefit from the load diversities within the group, but that benefit is at the expense of the other participants in NEPOOL. Accordingly, the Commission concluded that single participant status should be limited to utilities traditionally viewed as a single entity such as the Vermont utilities, which are contiguous systems that have historically acted as one unit for purchasing power. The Commission's distinction thus has a reasonable basis and must be affirmed. Moreover, counsel for the Executive Committee assured this court that if these municipalities functionally and legally integrate their systems, they will be accorded single participant status.

4. Section 9.4(d) provides:

(d) If a Participant's average of minimum monthly System Capabilities during a Capa-

pant pays a penalty of $4.40 for each kilowatt that its system capability is one to two percent below its capability responsibility, and it pays $22.00 for each kilowatt that the difference exceeds five percent.

The Commission held that section 9.4(d) unduly discriminates against small participants. For the same number of deficient kilowatts, the Commission said, a small participant due to its lesser capability responsibility will pay more than a large participant. It found this impermissible because NEPOOL is affected by a capacity shortage on the basis of the number of kilowatts a participant is short, not the percentage by which the participant is below its capability responsibility. The Commission therefore ordered that the section be modified to tax deficiency charges on the basis of the actual kilowatts a participant is deficient.

The Committee contends that the Commission has no jurisdiction over the deficiency charge imposed by section 9.4(d). The Committee says the charge functions solely as an incentive to encourage partici-

pants to meet their capability responsibilities. As such, it argues, the deficiency charge does not represent a charge for a service or transmission.

The Commission ruled that it had authority to regulate the deficiency charge under the jurisdiction granted to it by sections 205(b)[5] and 206(a)[6] of the Act. Section 205(b) empowers the Commission to proscribe undue discrimination "with respect to any [jurisdictional] transmission or sale", and section 206(a) authorizes it to determine the reasonableness of a rate or charge for a jurisdictional service, or of a rule or practice "affecting" such a rate or charge.

■ We agree with the Commission's ruling, for section 9.4(d) affects the charge a participant must pay for the power and reserve service it receives when its load requirements exceed its system capability. Under section 12.5 of the agreement, a participant is entitled to receive power and reserve service from other participants when its load demand is greater than its

bility Period is more than one percent below the Participant's Capability Responsibility for such Capability Period, such Participant shall pay into the Miscellaneous Expense Fund a Capability Responsibility deficiency charge for the Capability Period computed as follows:

.2 x rate   prescribed by Section 9.4(b)* for each KW of deficiency above one percent and not more than two percent

.4 x rate   prescribed by Section 9.4(b) for each KW of deficiency above two percent and not more than three percent

.6 x rate   prescribed by Section 9.4(b) for each KW of deficiency above three percent and not more than four percent

.8 x rate   prescribed by Section 9.4(b) for each KW of deficiency above four percent and not more than five percent

1.0 x rate   prescribed by Section 9.4(b) for each KW of deficiency above five percent

Prior to any Power Year, the Management Committee may review and change the Capability Responsibility deficiency charge.
* The rate prescribed by section 9.4(b) is $22.00 per kilowatt year. [Footnote * added]

5.  Section 205 provides in part:
    (a) All rates and charges made, demanded, or received by any public utility for or in

connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
    (b) No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

6.  Section 206(a) provides:
    Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any such rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

system capability. Because the level of a participant's capability responsibility is computed on the basis of its load requirements, a participant risks that its capability responsibility will exceed its system capability if its load requirements continue to surpass its system capability. Should a participant's capability responsibility be found to exceed its system capability it must pay the adjustment charge under section 9.4(b); and if the difference is more than one percent the participant in addition must pay the deficiency charge under section 9.4(d).

A participant thus incurs both the adjustment and the deficiency charge as a consequence of the power and reserve service made available to it when its load requirements exceeded its system's capacity. Indeed, NEPOOL's witness testified that the adjustment charge represents compensation for the services the overloaded participant receives, and the monies generated by the adjustment charge are distributed to the putative suppliers of these services, those participants with more than their required capacity for the billing period. The Committee therefore readily concedes that the adjustment charge ·is within the Commission's jurisdiction.

The deficiency charge, like the adjustment charge, must be deemed to be within the Commission's jurisdiction because it too represents a charge for the power and service the overloaded participant receives—or it is at least a rule or practice affecting the charge for these services. This is clear from the purpose behind the deficiency charge; the reason for the charge is that the adjustment charge as a minimum compensatory fee may be inadequate to motivate participants to develop sufficient ca-

pacity to meet their load requirements. In fact, the deficiency charge appears to be merely a surcharge added to the adjustment charge; the rate for the deficiency charge is an increasing fraction of the rate under the adjustment charge and the base for computing both charges is the same—the extent in kilowatts that a participant's capability responsibility surpasses its system capability. *See* note 4, *supra.* Although the Committee urges that we distinguish the jurisdictional bases of the adjustment and the deficiency charge on the ground that the former is intended as compensation whereas the latter is designed as an incentive,[7] we think the Commission's inclusive jurisdictional mandate—which reaches discriminatory practices "with respect to" jurisdictional transmissions, or "affecting" such transmissions or services—cannot be parsed so nicely. It is sufficient for jurisdictional purposes that the deficiency charge affects the fee that a participant pays for power and reserve service, irrespective of the objective underlying that charge. This authority is well within the Commission's authority as delineated in other court opinions. *See, e. g., FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976).

▬ The Committee next contends that the Commission's finding that section 9.4(d) is unduly discriminatory is unsupported by the record. We disagree. The Commission's staff economist testified that for a given number of deficient kilowatts a small participant pays a greater deficiency charge than a large participant. The discriminatory effect revealed by this testimony was corroborated by other testimony.[8] Indeed,

7. The Committee also notes that the revenues from section 9.4(b), unlike those from section 9.4(d), are distributed to participants with capacities exceeding their pool obligations. The penalties assessed under section 9.4(d) go instead into a general fund to pay pool expenses. The expenses offset by these deficiency charges would otherwise be paid by NEPOOL participants, who are accountable for them in proportion to their load sizes. *See* section 14.3 of the Agreement. The Committee contends that sections 9.4(b) and (d) should also be distinguished according to this difference in the distribution

of the fees generated by them. We think however that the ultimate distribution of the deficiency charge does not in any way diminish the effect of section 9.4(d) on a participant paying the charge; nor does this distribution imply that the deficiency charge is not imposed as a consequence of the power and service the participant received.

8. Smith, the staff economist, testified:

Using the sliding scale to determine the penalty payments, a 100 Mw system whose

the disparate impact of section 9.4(d) seems clear from the section's formulation. Nor has the Committee pointed to any evidence to contradict the Commission's conclusion that the effect on NEPOOL of a participant's generating capacity being inadequate is in terms of the number of kilowatts the participant is short. In fact, the Committee concedes in its brief that the effect is not on the basis of the percentage by which a participant falls below its capability responsibility. (*See* Petitioner's Brief at 31) Determining the effect on NEPOOL of a capacity shortage is a matter well within the Commission's expertise, and absent a showing that it lacked a rational basis or that it was contrary to the evidence in the record, the Commission's determination must be sustained. The Committee has made no such showing.[9]

## CONCLUSION

The Commission has not abused its discretion. Its resolution of the contentions raised in the petitions for review is reasonable and supported by the record. The petitions for review are therefore denied.

*So ordered.*

---

responsibility is 10 Mw more than its capacity pays NEPOOL $220,000 (10 × $22,000); a 500 Mw system that is deficient the same 10 Mw would pay $44,000 (10 × .2 × $22,000); a 1,000 Mw system deficient 10 Mw would pay NEPOOL nothing. (J.A. 57)

This testimony was challenged by a later witness because it failed to take into account that the charge is computed incrementally and that a one percent tolerance is allowed under the section. These two factors do reduce the amount paid under section 9.4(d) but they heighten, not lessen, its disparate impact. In fact, the witness who challenged Smith's figures testified that the correct deficiency charges that the three hypothetical systems would pay for a 10 MW shortage are as follows: A 100 MW system would pay $147,000, a 500 MW system $21,560, and a 1,000 MW system would pay no charge because the 10 MW

shortage represents only one percent of its capability responsibility. (J.A. 110)

Moreover, counsel for the Committee admitted at argument that for a specified kilowatt shortage (5 MW was given as an example) a small participant pays more than does a large one.

9. The Committee also challenges the Commission's order requiring that section 9.4(d) be revised to reflect penalties based only on the actual number of kilowatts a participant is short. The Committee contends that even if the Commission's finding that section 9.4(d) is unduly discriminatory is correct, the order is itself invalid because it is not based on substantial evidence. The order, however, is no more than a restatement of the Commission's finding in mandatory terms.