606 F.2d 1156
 196 U.S.App.D.C. 249, 1979-2 Trade Cases 62,779
 CENTRAL IOWA POWER COOPERATIVE, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
ALEXANDRIA BOARD OF PUBLIC WORKS, MINNESOTA, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Central Iowa Power Cooperative, et al., Intervenors.
PUBLIC UTILITIES COMMISSION OF the STATE OF SOUTH DAKOTA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Central Iowa Power Cooperative, et al., Intervenors.
 Nos. 77-1914, 77-1916 and 77-1924.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 30, 1978.
Decided July 9, 1979.
 
 James F. Fairman, Jr., Washington, D. C., with whom John C. Scott and Susan M. Jenkins, Washington, D. C., were on the brief, for petitioners in No. 77-1916.
 Alan J. Roth, Washington, D. C., with whom Robert C. McDiarmid, George Spiegel, Sandra J. Strebel, and Frances E. Francis, Washington, D. C., were on the brief, for petitioners in No. 77-1924.
 William J. Madden, Jr., Washington, D. C., with whom Donald K. Dankner, Washington, D. C., was on the brief, for petitioners in No. 77-1914 and intervenors in Nos. 77-1916 and 77-1924.
 James E. Rogers, Jr., Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Howard E. Shapiro, Solicitor, Federal Energy Regulatory Commission, Washington, D. C., was on the brief, for respondent.
 Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., also entered an appearance for respondent.
 Before TAMM and ROBINSON, Circuit Judges, and JOHN H. PRATT,* United States District Judge for the District of Columbia.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 This case involves challenges to provisions of the Mid-Continent Area Power Pool (MAPP) Agreement. The Federal Power Commission (Commission) found that the membership criteria of the Agreement were discriminatory and ordered modifications.[1] The Commission approved the Agreement in all other respects. For the reasons that follow, we affirm the Commission's decision.
 
 BACKGROUND
 
 2
 In 1972, thirty-one electric power systems signed the MAPP Agreement.[2] The original parties to the Agreement were twelve investor-owned utilities,[3] eight cooperative corporations,[4] eight municipal systems, two state public power districts, and the Federal Bureau of Reclamation.[5] The Agreement covers the mid-continent area of Minnesota, Iowa, North and South Dakota, Nebraska, eastern Montana, western Illinois, and Wisconsin.[6]
 
 
 3
 The Agreement is designed to promote reliable and economical operation of the interconnected electric network in the mid-continent area, primarily through reserve sharing to back up large generating units.[7] Although the Agreement does not establish a fully integrated electric system with central dispatch of generating units, it provides a mechanism for coordinated daily operation of generation facilities and seeks to promote the staggered construction of new generation units.[8] Each participant retains responsibility for serving its customers' demands.[9] Exchanges of power under the Agreement are on a short-term basis and may not be used to fulfill long-term needs. The Agreement does not preclude participants from entering into other joint arrangements for power pooling, nor does it compel or restrict installation of new facilities.[10]
 
 
 4
 The MAPP participants filed the Agreement with the Commission as required under section 205 of the Federal Power Act (Act), 16 U.S.C. § 824d (1976). After hearings,[11] an administrative law judge (ALJ) approved the Agreement in its entirety. Joint Appendix (J.A.) II at 345. On review of the ALJ's decision, the Commission held that, with the exception of the membership provisions, the Agreement was just, reasonable, and nondiscriminatory and did not violate antitrust law or policy. Id. at 403.
 
 
 5
 Three sets of petitioners seek review of the Commission's decision in this court. Petitioners Alexandria Board of Public Works, et al. (Alexandria) consist primarily of municipal electric utility systems, rural electric cooperatives, farm organizations, and state power-planning agencies in the mid-continent area.[12] Petitioner Public Utilities Commission of the State of South Dakota (South Dakota) is authorized under the laws of South Dakota to determine rates for private electric companies, define service territories for cooperative, municipal and private electric systems, rule on some securities matters and license certain plant facilities.[13] Petitioners Central Iowa Power Cooperative, et al. (Central Iowa) are the original full membership nonfederal participants in the Agreement.[14]
 
 ANTITRUST CONTENTIONS
 
 6
 Alexandria attacks the Commission's approval of the MAPP Agreement primarily on antitrust grounds. Although the Commission lacks authority to adjudicate violations of the antitrust laws, it must consider competitive factors when acting under the public interest mandate of the Act. Central Power & Light Co. v. FERC, 188 U.S.App.D.C. 56, 57, 575 F.2d 937, 938 (per curiam), Cert. denied, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652 (1978). In Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973), the Supreme Court stated that the Commission has "responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations pursuant to §§ 202 and 203, and under like directives contained in §§ 205, 206, and 207" of the Act.[15]Id. at 758-59, 93 S.Ct. at 1878; See FPC v. Conway Corp., 426 U.S. 271, 278-79, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976).
 
 
 7
 Congress has decided, as a matter of general policy, that power pooling arrangements, rather than unrestrained competition between electric facilities, are in the public interest. Section 202(a) of the Act, 16 U.S.C. § 824a(a) (1976), provides:
 
 
 8
 For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy . . . . It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts.
 
 
 9
 In enacting this section, Congress was "confident that enlightened self-interest will lead the utilities to cooperate . . . in bringing about the economies which can alone be secured through . . . planned coordination." S.Rep.No.621, 74th Cong., 1st Sess. 49 (1935).[16]
 
 
 10
 Thus, when the Commission determines the lawfulness of a power pooling arrangement challenged on antitrust grounds, it is to be guided by the clear congressional policy of section 202(a). Specifically, the Commission must consider whether the arrangement imposes negative restrictions on competition, whether such restrictions are reasonably related to valid purposes of the power pool, and whether the arrangement is, on the whole, in the public interest. See generally City of Huntingburg v. FPC, 162 U.S.App.D.C. 236, 238, 498 F.2d 778, 788 (1974). See also Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 226-28, 399 F.2d 953, 959-61 (1968).
 
 
 11
 Alexandria presents several antitrust arguments. First, it alleges that the MAPP Agreement represents unlawful price-fixing under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and section 10(h) of the Federal Power Act, 16 U.S.C. § 803(h) (1976). The Agreement contains a series of service schedules[17] that set forth rates for the furnishing of power thereunder. Alexandria presented no evidence directly related to these schedules, but contended that the schedules represented per se violations of the antitrust laws. The ALJ ruled, and the Commission agreed, that the rate schedules did not constitute unlawful price-fixing. The ALJ explained:
 
 
 12
 This is not a combination of sellers conspiring to fix a uniform price in which they will sell goods to outside parties. It is a group of participants who expect over the course of time to be buyers as often as they are sellers. This concept is basic to the equitable utilization of the MAPP service schedules.[18]
 
 
 13
 We hold that establishing a price for the short-term power services available under the Agreement is reasonably necessary to the functioning of the cooperative arrangement undertaken pursuant to section 202. Although the pricing provisions restrict competition in transactions between pool members, they insure that costs and benefits of the power pool will be shared fairly and predictably. Moreover, some exchanges of power between the participants may take place so rapidly that price negotiations at the time of exchange would be difficult.[19] Since the schedules are reasonably necessary to the pooling arrangement, we affirm the Commission's judgment that the rate provisions of the various schedules do not render the Agreement inconsistent with the public interest. See Broadcast Music, Inc. v. CBS, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).
 
 
 14
 Alexandria criticizes the Commission's failure to discuss possible anticompetitive consequences of provisions for "allocation of sales and for boycott of outside systems until MAPP's surpluses are exhausted." Brief for Alexandria at 41. Apparently, Alexandria is referring to provisions of the Agreement that permit participants to purchase power from each other on a short-term basis to cover deficiencies in accredited generation capability.[20] Accredited generation capability is essentially the amount of generation capacity a participant must maintain to satisfy its own system demand and meet its reserve obligation to the pool.[21]
 
 
 15
 Under the Agreement, deficiencies in accredited generation capability may be covered by installation of new generation facilities or by the purchase of power from other suppliers.[22] Participants may purchase power from MAPP members as well as from nonmembers. If a participant elects to purchase outside the pool, the Pool Administrative Committee must determine that the source of supply is reliable. Transactions between pool members are governed by the terms of the Agreement's service schedules. See note 17 Supra.
 
 
 16
 If a participant fails to make voluntary arrangements for maintaining accredited generation capability, the Pool Administrative Committee will require the deficient member to purchase the necessary power within the pool. The Pool Administrative Committee selects the participant or participants who will supply that power. If surplus power is not available within the pool, the Committee may recommend purchase from nonparticipants.
 
 
 17
 Central Iowa asserts that Alexandria's claims of sales allocation and boycott are based on a "complete misunderstanding of the way the pool operates." Brief for Central Iowa at 25. It argues that pool members are free under the Agreement to decide whether they will fulfill their accredited generation capability requirement by purchase within or without the pool. Id. at 25-26. The ALJ agreed, concluding that the Agreement does not restrict purchases or sales of bulk power. J.A. II at 372.
 
 
 18
 We hold that the challenged provisions represent the essence of a voluntary agreement for the coordination of facilities to achieve increased reliability and economies in operation. See generally Federal Power Commission, The 1970 National Power Survey at I-17-1 (1971).[23] As we have explained, MAPP seeks to promote reliable operation of the interconnected regional network, primarily through reserve sharing to back up large generating units. To achieve this goal, MAPP members must be able to insure that each party maintains accredited generation capability that can be called upon for reserve energy. If a member decides to maintain accredited generation capability by purchasing outside the pool, MAPP members must be assured that the outside source is reliable. Otherwise, there is no guarantee that reserve energy will actually be available when needed. If a member fails to make voluntary arrangements to cover deficiencies in accredited generation capability, the pool, if it is to maintain overall reserve assurance, must be able to require the deficient member to purchase power. The pool, which lacks authority to compel sales from outside sources, must depend on members with surplus energy to sell power to deficient members. Selection of the selling member or members in accordance with the valid interests of the pool reasonably furthers the pool's objectives. The challenged provisions of the Agreement clearly do not represent an illegal group boycott or sales allocation scheme, and the Commission did not err in failing to discuss them as such.
 
 
 19
 Alexandria further contends that the Agreement effectively destroys potential competition from nongenerating distribution systems by denying them services essential to their entry into the generating business. According to Alexandria, newcomers may be unable to obtain financing or may be unwilling to make the necessary investment to enter the generation business without commitments for the back-up of any proposed generation unit. Alexandria concludes that the Agreement is unlawful because it limits reserve sharing to participants who own and use generation.
 
 
 20
 Alexandria relies on Associated Press v. United States, 326 U.S. 1, 13-14, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), to support its argument that the Agreement's failure to include nongenerating distribution systems is anticompetitive. In that case, the bylaws of a cooperative association engaged in gathering and distributing news prohibited members from selling to nonmembers. The bylaws were designed to destroy competition and effectively did so. In those circumstances, the Supreme Court held that the bylaws violated the antitrust laws.
 
 
 21
 Alexandria's argument misconceives the thrust of the MAPP Agreement. First, the Agreement does not prohibit or restrict participants from entering into reserve arrangements with nonmember distribution companies. Indeed, the Agreement explicitly recognizes the possibility of such arrangements.[24] Second, nongenerating distribution systems that desire to enter the generating business may submit construction plans to MAPP for consideration and may attend MAPP meetings at which long-range plans are discussed.[25] Under the modified membership provisions, See text at 1170-1172 Infra, any distribution company interconnected with a MAPP participant that wishes to construct generation facilities is assured of eligibility for pool membership, and the consequent benefits of reserve sharing, when the facilities are operational.
 
 
 22
 The pooling arrangement before us is thus fundamentally different from that presented in Associated Press v. United States, 326 U.S. at 13-15, 65 S.Ct. 1416. Cf. City of Huntingburg v. FPC, 162 U.S.App.D.C. at 239-40, 498 F.2d at 781-82 (case remanded for consideration of anticompetitive effects of pool agreement limiting participant's wholesale power sales to nonmembers). Moreover, the Commission has stated that it will monitor access to the planning functions of MAPP and, if necessary, institute improvements.[26] We affirm the Commission's decision that the failure to include nongenerating distribution systems in MAPP is not anticompetitive and does not render the Agreement inconsistent with the public interest.[27] See Municipalities of Groton v. FERC, 190 U.S.App.D.C. 399, 401-403, 587 F.2d 1296, 1298-1300 (1978). See also Municipal Electric Association v. FPC, 134 U.S.App.D.C. 310, 313-14, 414 F.2d 1206, 1209-10 (1969).
 
 
 23
 Alexandria also asserts that past conduct by MAPP participants demonstrates the anticompetitive ends of the Agreement. It argues that the Agreement is designed to formalize and perpetuate a set of anticompetitive practices developed by the participants over several years. The ALJ ruled, and the Commission agreed, that Alexandria failed to produce evidence to support its allegations.[28] We have reviewed the record in this case and find that there is substantial evidence underlying the Commission's decision. See Gainesville Utilities Department v. Florida Power Corp., 402 U.S. 515, 526-27, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971) (citing 16 U.S.C. § 825L (b)).[29]
 
 
 24
 Alexandria finally interprets the Commission's decision as holding that the Agreement is acceptable as long as it is not more anticompetitive than prior pooling agreements. This is an inaccurate reading of the Commission's decision. In affirming the ALJ's conclusion that MAPP would improve power pooling in the mid-continent area, the Commission stated:
 
 
 25
 We do, however, wish to clarify one point. While the Administrative Law Judge is correct that the pooling agreement under consideration need not necessarily advance pooling beyond prior agreements it supersedes, in the event that the new pooling agreement under review reduces competition in contrast to the prior agreements the Commission would have to find in the new pool public interest advancements outweighing the reduction in competition. Since, we find Infra, no reduction in competition resulting from MAPP when properly modified, such a balance is not required.
 
 
 26
 J.A. II at 406 (footnote omitted).[30] The Commission then agreed with the ALJ that Alexandria "(had) not shown that the MAPP Agreement, with the exception of its membership provisions . . . is anticompetitive." Id. at 408. In so ruling, the Commission correctly described the role of anticompetitive considerations:
 
 
 27
 "(B)ecause competitive considerations are important elements of the public interest, we believe that in a case such as this the Commission was obliged to make findings related to the pertinent antitrust policies, draw conclusions from the findings, and weigh these conclusions along with other important public interest considerations."
 
 
 28
 Id. at 409 (footnote omitted) (quoting Northern Natural Gas v. FPC, 130 U.S.App.D.C. at 228, 399 F.2d at 961). The Commission's analysis of Alexandria's allegations was not based on a comparison of the possible anticompetitive effects of the Agreement with the effects of prior power pools. The Commission considered Alexandria's various antitrust contentions without regard to prior pooling arrangements and held that the Agreement was in the public interest. We are satisfied that the Commission engaged in the appropriate legal analysis.
 
 SCOPE OF MAPP SERVICES
 
 29
 South Dakota argues that the scope of MAPP services is too limited and that the Commission failed fully to consider expanding MAPP services. Specifically, South Dakota asks this court to remand the case to the Commission with directions to consider whether MAPP participants should be required to construct larger generation units[31] and engage in single system planning with central dispatch. South Dakota bases its arguments on several theories.[32] Petitioner Alexandria makes substantially the same arguments in its brief.
 
 
 30
 In responding to the argument that the scope of the MAPP Agreement was too limited, the Commission stated:
 
 
 31
 We reject the position of (Alexandria) and South Dakota that MAPP must be transformed from its present limited scope to one offering all conceivable pooling services. While Section 202(a) of the Federal Power Act speaks in terms of "voluntary interconnection and coordination" and to "promote and encourage" the same, the pooling agreement is an FPC tariff which must pass muster under Sections 205 and 206 of the Federal Power Act. For example, we have already found the membership provisions unacceptable. Nevertheless, the scope of a power pool is in the first instance a matter for the utilities involved. The mere fact that a particular pool does not offer the same range of services as another pool does not permit the Commission to direct expansion of the narrower pools' scope. Unless the limited scope of the MAPP Agreement is for some other reason unjust, unreasonable or unduly discriminatory, we are not authorized under Part II of the Federal Power Act to direct the pool to offer more services. While we can and do "encourage and promote" greater use of pooling, the peculiarities of each region necessitate that the member utilities determine the services to be offered. One cannot automatically apply the broader scope of NEPOOL, based upon very different geography, industry history and make-up in New England, to the mid-continent region with its tremendous area, sparse load and different industry make-up.
 
 
 32
 J.A. II at 420.
 
 
 33
 We are satisfied that the Commission reached an informed and reasoned decision consistent with congressional purposes. See Municipalities of Groton v. FERC, 190 U.S.App.D.C. at 402, 587 F.2d at 1299.[33] Congress has concluded that regional coordination of electric power systems by means of regional power pools is in the public interest. See text at 1162-1163 Supra. Section 202(a) recognizes that power pooling can yield benefits of efficiency and economy.[34] Notwithstanding the desirability of coordination of electric systems, however, Congress decided to make such coordination voluntary, with limited exceptions.[35] See S.Rep.No.621, 74th Cong., 1st Sess. 19, 49 (1935); H.Rep.No.1318, 74th Cong., 1st Sess. 8, 27-28 (1935). Congress was convinced that "enlightened self-interest" would lead utilities to engage voluntarily in power planning arrangements, and it was not willing to mandate that they do so. S.Rep.No.621, 74th Cong., 1st Sess. 49; See Otter Tail Power Co. v. United States, 410 U.S. 366, 374, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). Given the expressly voluntary nature of coordination under section 202(a), the Commission could not have mandated adoption of the Agreement, and failure of the MAPP participants to establish a fully integrated electric system[36] could not justify rejection of the Agreement filed.
 
 
 34
 The Commission had authority, however, under section 206 of the Act, 16 U.S.C. § 824e (1976), to order changes in the limited scope of the Agreement, including the addition of pool services, if, in the absence of such modifications, the Agreement presented "any rule, regulation, practice or contract (that was) unjust, unreasonable, unduly discriminatory or preferential." See Municipalities of Groton v. FERC, 190 U.S.App.D.C. at 404-06, 587 F.2d at 1301-03. We agree with South Dakota that the Commission should consider the policies of the Federal Power Act in making a determination under this section. This does not mean, however, that a pooling plan is unlawful under section 206 merely because a more comprehensive arrangement might better achieve the purposes of section 202(a). To so conclude would undermine Congress's determination that coordination under section 202(a) be voluntary. Moreover, we cannot agree with South Dakota that in approving the Agreement the Commission abdicated its duty under section 202(a) to promote and encourage regional interconnection and coordination of electric facilities.
 
 
 35
 South Dakota also argues that the Commission "erred as a matter of law" in concluding that it could not direct the pool to offer more services even if the pool arrangement were unreasonable. We find the assertion spurious.[37] The Commission ruled only that Unless the MAPP Agreement was unjust, unreasonable or unduly discriminatory, it lacked statutory authority to compel additional services.
 
 
 36
 Finally, South Dakota contends that the Commission should have considered ordering MAPP participants to wheel[38] electric power to nongenerating electric systems. This court has previously rejected a similar argument. In Richmond Power & Light v. FERC, 187 U.S.App.D.C. 399, 574 F.2d 610, (1978), the court recounted the Supreme Court's decision in Otter Tail Power Co. v. United States:
 
 
 37
 "As originally conceived, Part II (of the Federal Power Act) would have included a 'common carrier' provision making it 'the duty of every public utility to . . . transmit energy for any person upon reasonable request . . . .' In addition, it would have empowered the Federal Power Commission to order wheeling if it found such action to be 'necessary or desirable in the public interest.' H.R.5423, 74th Cong., 1st Sess.; S.1725, 74th Cong., 1st Sess. These provisions were eliminated to preserve 'the voluntary action of the utilities.' S.Rep.No.621, 74th Cong., 1st Sess. 19.
 
 
 38
 It is clear, then that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships."
 
 
 39
 187 U.S.App.D.C. at 408, 574 F.2d at 619 (quoting Otter Tail Power Co. v. United States, 410 U.S. at 374, 93 S.Ct. at 1028). This court concluded that arguments advocating mandatory wheeling in lieu of relying on voluntary wheeling should be addressed to Congress. Id. Although Congress has recently taken action permitting the Commission to order wheeling in certain circumstances,[39] this legislation is inapplicable to the case before us.[40] Given the voluntary nature of power pooling under section 202(a), and Congress's particular determinations with respect to wheeling, we uphold the Commission.
 
 
 40
 Alexandria argues that the Agreement should have been rejected because it did not offer services beyond those of pools which previously operated in the mid-continent area. The ALJ found, and the Commission agreed, that MAPP is an improvement over earlier pools.[41] In addition, the ALJ and the Commission held that a pool agreement that supersedes a prior arrangement is not unlawful merely because it does not offer new services.[42] We agree with the Commission on both counts.
 
 
 41
 The most obvious improvement of the Agreement is enhanced reserve assurance. By combining the pool operations of the Bureau of Reclamation with the various other power pools existing in the mid-continent region, MAPP has increased the number of generating units committed to back up other units in the pool. See generally Gainesville Utilities Department v. Florida Power Corp., 402 U.S. at 518-20 & n. 3, 91 S.Ct. 1592. However, even if a newly filed pool agreement merely streamlined or updated prior agreements without initiating substantive changes in pool services, nothing in sections 202(a), 205, or 206 of the Act suggests that this alone would be sufficient to hold it unlawful. Such a conclusion would be inconsistent with Congress's intent to promote planned coordination of electric systems.
 
 MEMBERSHIP PROVISIONS
 
 42
 Article IV of the Agreement establishes pool membership requirements. Under the Agreement, any "entity engaged in the electric utility business which owns or leases, and controls the operation of, one or more generating units, and which entity is electrically interconnected with one or more Parties to this Agreement"[43] may become a MAPP party. Parties are divided into two classes: participants, who are entitled to representation on all pool committees and participation in the full range of pool services; and associate participants, who are entitled to representation on certain pool committees and participation in pool planning functions. To become a participant, a party is required to meet certain requirements. It must be a party:
 
 
 43
 a. Whose system is normally operated directly interconnected with two or more electric systems; and
 
 
 44
 b. Which owns or controls transmission facilities operated at 115 kilovolts or higher forming an integral part of the regional transmission network; and
 
 
 45
 c. Whose system contributes significantly as determined by the Management Committee to the reliability of the interconnected systems operation; and
 
 
 46
 d. Which operates or participates in the operation of a 24-hour dispatch center with a terminal on the communication network connecting the Participants.
 
 
 47
 J.A. II at 221-22. Parties not meeting these criteria are associate participants.
 
 
 48
 The Commission staff contended before the ALJ that the Agreement created an unreasonable distinction between participants and associate participants. The ALJ nonetheless held the provisions were just, reasonable, and not unduly discriminatory or preferential.[44] On review of the ALJ's decision, the Commission agreed with the staff. It found the distinction between participants and associate participants discriminatory on its face under sections 205 and 206 of the Act.[45] It reversed the ALJ's decision with respect to membership criteria, and held that "as far as access to the operational functions of MAPP, Staff is correct that ownership and use of generation and at least one interconnection is the minimum criterion." Id. at 417.[46]
 
 
 49
 Both Alexandria and Central Iowa attack the Commission's decision. Alexandria argues that the Commission did not go far enough in ordering modification of the membership provisions and that it should have opened MAPP services to nongenerating distribution systems. Central Iowa argues that there was no evidence to support the Commission's conclusion that the membership provisions were discriminatory and that the Commission unlawfully changed the purposes of the MAPP Agreement.
 
 
 50
 We are satisfied that the Commission, in modifying the membership provisions, reached a reasoned decision based on substantial evidence. See 16 U.S.C. § 825L (b) (1976). See generally Gainesville Utilities Department v. Florida Power Corp., 402 U.S. at 527, 91 S.Ct. 1592; Municipalities of Groton v. FERC, 190 U.S.App.D.C. at 402, 406, 587 F.2d at 1299, 1303. Insofar as Alexandria attacks the revised membership provisions on specific antitrust grounds, we have previously discussed why that argument is without merit. See text at ----, 606 F.2d 1165 Supra. Nongenerating distribution systems are not excluded from participation in MAPP planning functions; nor are MAPP participants prohibited from making reserve generation commitments to distribution systems that desire to enter the generation business. Id. Alexandria implies in its brief that the Agreement will result in the denial of wholesale power to small nongenerating distribution systems. We have no reason to believe, on the record before us, that such conduct will occur. The MAPP Agreement does not apply to long-term wholesale power arrangements and specifically recognizes that participants may freely enter into outside contracts for the sale of electric power.[47] Further, the current successor to the Bureau of Reclamation is statutorily required to prefer municipal systems and public cooperative corporations in the sale of electric power.[48] The Commission has warned that if MAPP participants engage in anticompetitive conduct, the conduct will be subject to commission scrutiny.[49]
 
 
 51
 We also disagree with Central Iowa's contention that the Commission's finding that the membership provisions are unduly discriminatory is unsupported. The MAPP Agreement excludes generating electric systems with only one interconnection and with less than the specified level of transmission capability from participation in MAPP's service schedules, including the reserve energy schedule. These systems could clearly benefit through use of MAPP's services, particularly reserve sharing.[50] See generally Gainesville Utilities Department v. Florida Power Corp., 402 U.S. at 518-20 & n.3, 91 S.Ct. 1592. The Commission held that exclusion of the smaller generating systems was not reasonably related to MAPP's objectives and that the pool would not be injured by inclusion of such systems as long as they provide compensation for the true value of transmission services, whether in kind or in money. The Commission directed the MAPP participants and the Commission staff to develop a formula for fair compensation to be paid by those participants unable to reciprocate for transmission in kind.[51] This is a matter well within the Commission's expertise, and we are convinced that its decision is reasonable and supported by substantial evidence.[52] See Municipalities of Groton v. FERC, 190 U.S.App.D.C. at 406, 587 F.2d at 1303.
 
 CONCLUSION
 
 52
 The petitioners in this case attack the Commission's decision both for going too far in modifying the MAPP Agreement, and for not going far enough. We have considered all of the arguments raised, and we conclude that the Commission has struck a proper balance in accepting, with modified membership provisions, the Agreement. Therefore, the Commission's decision is
 
 
 53
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 The Commission functions involved in this case were transferred to the Federal Energy Regulatory Commission (FERC) on October 1, 1977, pursuant to section 402 of the Department of Energy Organization Act, 42 U.S.C.A. § 7172(a) (1978). See Exec. Order No. 12,009, 42 Fed.Reg. 46267 (1977). FERC was substituted as respondent in this case in accordance with 42 U.S.C.A. § 7295(e) (1978)
 
 
 [2]
 Joint Appendix (J.A.) II at 345 (Initial Decision on a Power Pool Agreement). The Commission adopted the findings of the administrative law judge (ALJ) with respect to the procedural background of the case, the nature of the electric utility industry in the mid-continent area, the history of coordination leading to the Agreement, and the Agreement itself. Id. at 403
 
 
 [3]
 The investor-owned utilities are "public utilities" within the meaning of section 201 of the Act, 16 U.S.C.A. § 824 (Supp.1979). Neither the Department of Energy Organization Act, Pub.L.No. 95-91, 91 Stat. 565 (1977), nor Title I of the Public Utility Regulatory Policies Act of 1978, Pub.L.No. 95-617, 92 Stat. 3117, applies to this proceeding. See 42 U.S.C.A. § 7295(c) (1978); 16 U.S.C.A. § 824 note (Supp. 1979). In citing to pertinent statutes, we therefore refer to those in force at the time of the Commission's decision
 
 
 [4]
 The operations of the cooperative corporations are financed, in whole or in part, by the Rural Electrification Administration. See 7 U.S.C. § 904 (1976)
 
 
 [5]
 The MAPP Agreement is applicable to a specific electric system operated by the Bureau of Reclamation in the Eastern Division of the Pick-Sloan Missouri Basin Program. J.A. II at 255
 The power marketing functions of the Bureau of Reclamation have been transferred to the Secretary of the Department of Energy and are exercised by a separate administration within that department. 42 U.S.C.A. § 7152(a) (1978); See 43 U.S.C. § 485h(c) (1976) (authority to sell electric power in connection with federal reclamation projects). In marketing electric power, the Bureau of Reclamation is required to give preferences to municipalities and other public corporations or agencies. Id.
 
 
 [6]
 J.A. II at 349
 
 
 [7]
 Id. at 356. The ALJ described the Agreement as follows:
 The MAPP Agreement itself is 72 pages long. It covers objectives, conditions of membership, relationships to other agreements, committees, committee organization, obligations of the parties (such as maintenance of adequate capabilities and operating reserves, service obligations, and services to be rendered), and participation by the United States Bureau of Reclamation and by the Manitoba Hydro-Electric Board. In addition, the Agreement contains a number of service schedules dealing with wheeling services and interchange services for participation power, emergency and scheduled outages, operating reserves, economy energy, operational control energy, and peaking, short-term and firm power. Exhibit A to the Agreement contains a list of the points of interconnection through which power and energy may be interchanged between the Participants (Exh. No. 935).
 Id. at 355.
 
 
 [8]
 Id. at 243, 358. In The 1970 National Power Survey, the Commission discussed the advantages of staggered construction:
 Staggered construction is a technique which involves construction of excess capacity by one utility for the use of one or more other utilities with the supplier-buyer arrangement being reversed or modified with each succeeding unit. Several variations of this practice are widely used. Sometimes adjacent systems informally coordinate their capacity additions over a period of several years so that the total installed capacity reserve approximates the amount required by the entire geographic area. Each individual system's reserve in percent of peak-hour load may vary widely from year to year, but the total peak-hour reserves for the group are maintained at approximately a constant level.
 A refinement of this coordinating technique includes short-term capacity transactions which permit a system to install a larger unit than its own immediate needs require and to sell firm capacity to neighboring systems for one or more years. Later this utility purchases firm capacity from neighboring systems for a period of time and then repeats the cycle by installing an even larger generating unit. This arrangement has found general acceptance by some power pools and other coordinating groups since each member can achieve benefits from economy of scale and maintain most economically the installed capacity reserves required by the coordinating group.
 Another form of staggered construction which has gained widespread acceptance in recent years is the unit-sale concept. This entails arrangements whereby a system installs a larger unit than it otherwise normally would, and sells a specified amount of excess capacity from that unit to one or more neighboring systems. The purchaser's entitlement is limited to the availability of capacity from the specific unit. In the event of an outage of such unit, the buyer is not entitled to any portion of the supplier's other capacity resources. Rates for unit sale transactions usually reflect actual capacity and energy costs from the specific unit involved.
 Federal Power Commission, The 1970 National Power Survey at I-17-23 (1971).
 
 
 [9]
 J.A. II at 238, 356
 
 
 [10]
 Id. at 356
 
 
 [11]
 The Commission conducted a hearing on the Agreement under, Inter alia, section 206 of the Act, 16 U.S.C. § 824e (1976). The burden of showing that an initial rate filing is unlawful under section 206 rests on those attacking the filing. See Municipalities of Groton v. FERC, 190 U.S.App.D.C. 399, 403 n.3, 587 F.2d 1296, 1300 n.3 (1978)
 
 
 [12]
 Brief for Petitioners Alexandria Board of Public Works, et al. (Alexandria) at 11-12. Alexandria describes itself as
 forty municipalities operating electric utility systems, forty rural electric cooperatives, four major farm organizations, two Kansas power-planning agencies, Kansas Municipal Utilities (a state-wide association of municipal electric systems), Montana Associated Utilities, Inc. (a state-wide association of rural cooperatives), the Burt County Public Power District (Nebraska), Mid-West Electric Consumers Association, Missouri Basin Municipal Power Agency, and the Mayor of Sioux Center, Iowa.
 Mid-West Electric Consumers Association is a trade association of consumer-owned utilities scattered throughout Colorado, Kansas, Wyoming, Montana, Nebraska, North Dakota, South Dakota, Minnesota and Iowa. The Missouri Basin Municipal Power Agency ("MBMPA") is a nonprofit organization of 64 municipal electric utilities serving a population base of approximately 220,000 in the states of Iowa, Minnesota, and South Dakota.
 Id.
 
 
 [13]
 Brief of the Public Utilities Commission of the State of South Dakota (South Dakota) at 4-5. Four of the six private, investor-owned utilities that provide service in South Dakota are participants in the MAPP Agreement. Most of the rural electric cooperatives and municipal electric systems in the state depend on other suppliers for generation. Id. at 5
 
 
 [14]
 Brief for Petitioners Central Iowa Power Cooperative, et al. (Central Iowa) at 6. MAPP membership was of two types: full membership participants who enjoyed all the benefits of the Agreement and associate participants who had limited privileges. See text at 1170-1172 Infra
 
 
 [15]
 These sections of the Federal Power Act appear at 16 U.S.C. §§ 824a, 824b, 824d, 824e, and 824f (1976) respectively. The Commission acted in this case under sections 202, 205, and 206 of the Act
 
 
 [16]
 A noted commentator has explained the advantages of coordination:
 There are two major benefits that can be achieved through pooling: (1) pools, properly planned and operated, can substantially improve the systems' reliability at considerably reduced cost; (2) pooling can result in large cost savings in the production and the transmission of power.
 Pooling arrangements are basically of two types. The first is designed primarily to accomplish a high degree of operational reliability on a day-to-day basis, but it will usually also reduce the relative cost of providing reliability. . . . The second type is designed to achieve these goals, plus the economies of joint planning and construction of generation and transmission facilities.
 Meeks, Concentration in the Electric Power Industry: The Impact of Antitrust Policy, 72 Colum.L.Rev. 64, 101 (1972); See note 8 Supra.
 
 
 [17]
 The service schedules are:
 Schedule A Participation Power Interchange Service
 Schedule B Seasonal Participation Power Interchange Service
 Schedule C Emergency and Scheduled Outage Energy Interchange Service
 Schedule D Operating Reserve Interchange Service
 Schedule E Economy Energy Interchange Service
 Schedule F Wheeling Services and Losses
 Schedule G Operational Control Energy Interchange Service
 Schedule H Peaking Power Interchange Service
 Schedule I Short Term Power Interchange Service
 Schedule J Firm Power Interchange Service
 J.A. II at 269-84.
 
 
 [18]
 Id. at 380
 
 
 [19]
 See Meeks, Supra note 16, at 111-12
 
 
 [20]
 Alexandria does not elaborate its argument in this court and was equally vague before the Commission. See, e. g., J.A. II at 448
 
 
 [21]
 See id. at 238 (P 15.01)
 
 
 [22]
 See id. at 238-40 (Article XV)
 
 
 [23]
 In The 1970 National Power Survey, Supra note 8, the Commission stated:
 Financial benefits are often realized from staggered construction of large generating units, short-term capacity transactions, and interchanges of economy energy. Reduction of installed reserve capacity is made possible by mutual emergency assistance arrangements and associated coordinated transmission planning. Bulk power supply reliability is enhanced by interconnection agreements covering spinning reserves, reactive kilovol-tampere requirements, emergency service, coordination of day-to-day operations, and coordination of maintenance schedules. Also, operating costs may be reduced through coordinated operation of interconnected systems.
 Id. at I-17-1.
 
 
 [24]
 J.A. II at 243 (P 19.01); See id. at 374-75
 
 
 [25]
 Id. at 231; See id. at 377
 
 
 [26]
 Id at 418
 
 
 [27]
 See id. at 410, 417. See also id. at 373-74, 385-88
 
 
 [28]
 Id. at 382-83, 412-13. Alexandria also suggests that particular pricing and power exchange procedures within the Agreement are "designed to protect inefficiency." Brief for Alexandria at 49. It refers to rate schedules not based exclusively on cost factors. Alexandria is not contesting the general reasonableness of price levels, See id. at 449, but contends that the rate-setting procedures are indicative of MAPP's anticompetitive nature. In upholding the schedules, the ALJ and the Commission relied on the need to stimulate short-term purchases of excess capacity in lieu of adding new capacity and to discourage reliance on emergency energy when units are less efficient. See id. at 381-82, 411-12 & n.14. We conclude that the Commission's decision that such procedures were not anticompetitive is reasonable
 
 
 [29]
 Thus, we need not consider the Commission's alternate conclusion that even if such conduct has occurred, it is irrelevant to determining the lawfulness of the Agreement
 
 
 [30]
 The Commission apparently was clarifying statements by the ALJ that participation in MAPP did not hamper the competition that does exist, Id. at 378, and that the systems not eligible to participate in MAPP were not eligible to participate in prior power pools, Id. at 387
 
 
 [31]
 Under 202(b) of the Act, 16 U.S.C. § 824a(b) (1976), the Commission is expressly prohibited from compelling the enlargement of generation facilities in connection with an order issued under that section
 
 
 [32]
 South Dakota argues that the Commission should have held the Agreement unreasonable under section 206(a) of the Act, 16 U.S.C. § 824e(a) (1976), because pool services were limited; that the Commission did not engage in reasoned decisionmaking; that the Commission failed to fulfill its duty under section 202(a) of the Act, 16 U.S.C. § 824a(a) (1976), to promote and encourage interconnection and coordination of facilities; and that the Commission erred in holding it has no authority to order increased pool services
 South Dakota also suggests that the Commission failed to carry out its responsibilities under section 207 of the Act, 16 U.S.C. § 824f (1976). We do not consider this argument because South Dakota failed to comply with that section's procedural provisions, which require, Inter alia, filing a complaint with the Commission and sending notice to all affected state commissions.
 
 
 [33]
 South Dakota suggests that the Commission gave inadequate attention to "national energy policy." Brief for South Dakota at 31-34. Specifically, South Dakota asserts that the Commission failed to act with the requisite urgency to conserve energy and failed to give due regard to coordination with the states. We disagree. The Commission had specific responsibility in this proceeding to decide whether a particular voluntary pool agreement was unjust, unreasonable, or unduly discriminatory. We have no reason to believe that its decision was inconsistent with "national energy policy." However, even if it could be so construed, we recall this court's recent decision in Richmond Power & Light v. FERC, 187 U.S.App.D.C. 399, 405-06, 574 F.2d 610, 616-17 (1978) (footnotes omitted):
 While an administrative agency must remain faithful to public policies directly related to its regulatory authority, surely at any given moment of history it may rationally decline to affirmatively foster other policies in weighing the specific interests that it is required by statute to consider.
 
 
 [34]
 See notes 8, 16, 23 Supra. See also Municipalities of Groton v. FERC, 190 U.S.App.D.C. at 401, 587 F.2d at 1298
 
 
 [35]
 Under section 202(b), 16 U.S.C. § 824a(b) (1976), the Commission, upon application of a state commission or a person engaged in the sale or transmission of electrical energy, may order a public utility to establish physical connection of its transmission facilities with another electric system and sell or exchange energy. The Commission may not compel the enlargement of generating facilities for such purpose or impose undue burden upon such public utility. See also § 202(c), 16 U.S.C. § 824a(c) (1976) (emergency powers)
 
 
 [36]
 The Commission explained the different degrees of power pooling in The 1970 National Power Survey, Supra note 8, at I-17-1 to I-17-2:
 There are thousands of arrangements among systems from all segments of the industry providing for various degrees and methods of electrical coordination. These variations reflect differences in load density, characteristics of generating resources, geography, and climate. They are also a product of managerial views with respect to planning, marketing, competition, and retention of prerogatives. Because of these differences, no single definition of coordination has been established by the electric utility industry. As used in this chapter, Coordination is joint planning and operation of bulk power facilities by two or more electric systems for improved reliability and increased efficiency which would not be attainable if each system acted independently. Full coordination involves coordination of all systems within an area, to the extent technologically and economically feasible to permit the serving of their combined loads with a minimum of resources and to exploit opportunities for coordination with adjacent areas.
 The highest degree of coordinated planning results when a group of utilities jointly plan, design, and construct their generation and transmission facilities as a single system. However, such coordinating groups must be large enough to take full advantage of the efficient generating units and EHV transmission made available by modern technology, yet be of manageable size with all members capable of sharing the responsibilities of the coordinated effort. Similarly, the highest degree of coordinated operation is achieved when a group of utilities operate all of their bulk power facilities as a single system.
 
 
 [37]
 See Brief for South Dakota at 21. We also reject South Dakota's assertion that the Commission's decision should be reversed because the Commission did not reopen the evidentiary proceedings to receive a report prepared by South Dakota in 1977 entitled An Evaluation of Power Supply Planning by the Six-Investor Owned Electric Utilities in South Dakota. Basically, the report concludes that MAPP participants continue to plan and construct "sub-optional" facilities. Brief for South Dakota at 24. The report apparently underlies South Dakota's arguments that the Commission should have ordered pool operations to result in enlargement of generation facilities. See text at --- U.S.App.D.C. ----, 606 F.2d 1166 Supra. South Dakota first referred to its ongoing "study of the power supply alternatives available to South Dakota" in its brief of exceptions to the ALJ's initial decision. J.A. II at 398. At that time, however, South Dakota specifically indicated that the present proceeding could be concluded without consideration of the report. South Dakota recommended reopening the record only "if the Commission believe(d) additional information would be useful." Id. at 399. In its petition for rehearing of the Commission's decision, South Dakota indicated it was prepared to present evidence that the Agreement "fails to establish reasonable mechanisms for more efficient regional planning and construction." Id. at 439. South Dakota then suggested that it join with the Commission in further investigation "if the . . . Commission finds the present record inadequate to evaluate the pool agreement and order necessary improvements." Id
 In view of the lack of a firm request for reopening of the record, and our decision with respect to the Commission's authority to mandate enlarged pool services, we cannot say that the Commission abused its discretion in failing to reopen the evidentiary record. See generally Willis Shaw Frozen Express, Inc. v. ICC, 191 U.S.App.D.C. 1, 7, 587 F.2d 1333, 1339 (1978).
 
 
 [38]
 "Wheeling is broadly defined as 'the transfer by direct transmission or displacement (of) electric power from one utility to another over the facilities of an intermediate utility.' " Richmond Power & Light v. FERC, 187 U.S.App.D.C. at 403 n. 9, 574 F.2d at 614 n. 9 (quoting Otter Tail Power Co. v. United States, 410 U.S. 366, 368, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973))
 
 
 [39]
 Under section 203 of the Public Utility Regulatory Policies Act of 1978, Pub.L.No.95-617, 92 Stat. 3136, 16 U.S.C.A. § 824j (Supp.1979), the Commission can order wheeling to an applicant electric utility or federal power marketing agency if certain criteria are met relating to conservation, efficiency, reliability, competitive impact, and burdens
 
 
 [40]
 See note 3 Supra
 
 
 [41]
 J.A. II at 365, 406
 
 
 [42]
 Id
 
 
 [43]
 Id. at 221
 
 
 [44]
 Id. at 384-85
 
 
 [45]
 The MAPP Management Committee submitted a filing with the Commission on March 6, 1979, which contains new membership provisions. This filing is the subject of ongoing Commission proceedings and we express no view on its merits
 
 
 [46]
 In ordering the modification of the membership provisions, the Commission stated:
 We agree with Staff that the membership criteria of Article IV of MAPP are not reasonably related to the MAPP objectives. Those objectives are the effectuation of reserve sharing so as to best develop through coordination reliable and economic generating capacity. As far as access to the operational functions of MAPP, Staff is correct that ownership and use of generation and at least one interconnection is the minimum criterion. The criteria now employed to differentiate Participants from Associate Participants all distill down to size of the system. While the smaller systems could conceivably benefit from MAPP membership, they do not have the transmission facilities to reciprocate in kind for the short-term transmission services included in the MAPP services schedules. Because of the significant advantages flowing from MAPP membership and the corresponding impact of denied access, we do not feel that this size criterion is reasonable. So long as the small utility can provide compensation for the true value of this transmission service, whether in kind or money, the pool should not be injured.
 Although the complexities involved in establishing some standard for monetary compensation do not deter the ultimate result that Article IV must be modified, they do cause us to proceed cautiously. Accordingly, we shall hereby direct Commission Staff to initiate dialogue with the MAPP Management Committee to develop a fair and equitable measure of compensation to be paid by those Participants which do not have the transmission wherewithal to reciprocate in kind. This process of modifying the membership provisions should be open so that any electric system in the mid-continent area can observe. Access to the MAPP planning function should also be improved as a part of this modification process. . . .
 In making this decision that the membership criteria must be modified, we do not deny the benefits which any utility, including those too small to presently become MAPP Participants, can glean from purely bilateral, non-pool reserve sharing arrangements; however, that fact does not mollify the discrimination inherent in Article IV which we must, under Sections 205 and 206 of the Federal Power Act, remedy. While there is no obligation for utilities in the first instance to have a pooling agreement, if one does exist it must be nondiscriminatory. Within the dynamics of the electric utility industry, the oftentimes subtle and yet significant long-term impact of power pooling demands our close scrutiny of provisions which deny access to the benefits of the pool. Thus the presence of such bilateral arrangements and the absence of denials of membership do not vindicate discrimination inherent in the membership provisions. In this regard, apart from the inherent discrimination Article 4.02(b) and (c) contain standards (forming an integral part of the regional transmission network and contributing significantly to the reliability of the interconnected systems operations) which are not sufficiently quantitative to assure objective and nondiscriminatory interpretation. This problem must be cured when the membership provisions are reformed.
 Id. at 417-18.
 
 
 [47]
 See, e. g., id. at 243 (P 19.01), 245 (P 19.09)
 
 
 [48]
 See note 5 Supra
 
 
 [49]
 J.A. II at 378
 
 
 [50]
 See id. at 417-18. See also id. at 365, 406
 
 
 [51]
 The filing submitted to the Commission by the MAPP Management Committee on March 6, 1979, See note 45 Supra, contains provisions covering payment for transmission services
 
 
 [52]
 J.A. II at 417-18. We cannot agree with Central Iowa that the Commission changed the purpose and intent of MAPP by allowing some generating electric systems to compensate MAPP members monetarily for transmission service. This feature will not relieve such systems from reserve obligations and should not have a detrimental impact on planning functions